THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES R. PATTERSON, Defendant-Appellant.

First District (4th Division)    No. 78-1561

Opinion filed September 18, 1980.—Rehearing denied October 9, 1980.

Ralph Ruebner and Michael J. Pelletier, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Eisenstein, and Cary J. Wintroub, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

In a jury trial defendant James Patterson was convicted of the murder of Henry Boyd. He was sentenced to a term of 14 to 42 years in the penitentiary. On appeal defendant makes the following contentions: (1) his guilt was not established beyond a reasonable doubt; (2) the trial court erred in failing to grant a new trial based on newly discovered evidence; (3) defendant was deprived of a fair trial when the State improperly cross-examined a defense witness concerning his alleged statement to the police about narcotics and also elicited rebuttal evidence concerning the statement; (4) final arguments by the State which implied that defendant and a defense witness were drug dealers prejudiced defendant.

We affirm.

At trial James Jackson testified for the State that he was a part-time bartender at the Monkey Club in Chicago. On March 20, 1975, Jackson arrived at the tavern at 6:30 p.m. Defendant, whom he knew as Elija, was sitting at the bar. At about 8 p.m. Henry Boyd and Larry Johnson came into the bar. Johnson began talking with Donald Cupcake in the rear of the bar. At this time Jackson was behind the bar, defendant was sitting at the bar close to the front door, and Boyd was standing three to five feet down the bar toward the middle. A fight broke out between Cupcake and Johnson. Cupcake said "Oh, he got a gun. Don't let him shoot, Elija." Boyd, who was about 20 feet from the fight, headed for the door. Defendant jumped up

and began firing. Jackson, who had gotten down on the floor, got up and saw Boyd lying on the floor with a hole in the back of his neck. Immediately before the shots were fired he had seen no weapons on the person of Boyd.

Investigator Anthony Bongiorno testified that he arrested the defendant. After being advised of his rights defendant told him that Boyd had been fighting with his friend in the tavern. The friend told defendant Boyd had a gun and defendant pulled out his gun and shot Boyd in the back of his neck.

The pathologist who examined the body of Henry Boyd found a small bullet lodged in the spine. The scar from the bullet was located on the rear of the neck on the upper portion on the left side. Boyd had died on July 12, 1975. It was the doctor's opinion that death was caused by complications arising from the bullet wound to the neck.

Defendant testified in his own behalf and presented three additional eyewitnesses. Donald Cupcake testified that about 8 p.m. that evening he had a conversation with Boyd and Johnson near the front of the tavern. Cupcake asked to see a ring and Johnson pulled out a gun. Cupcake began struggling with him while asking for help and saying that he was being held up. He denied having specifically asked defendant for help. At this time Boyd had placed a cold object, which might have been a pistol or knife, against Cupcake's neck. The defendant came over, Boyd began to go around Cupcake and then Cupcake heard a shot and Boyd was no longer "on" him. He continued struggling with Johnson until defendant forced Johnson at gunpoint to drop his gun. Cupcake left the tavern, discarding the gun recovered from Johnson in the alley.

Jackie Dixon, who had known the defendant for at least 13 years, was also present that night. He testified that Johnson began walking from the middle of the bar to the door where Boyd was located. A struggle began and Dixon saw Boyd with his hand on Cupcake. Boyd reached into his pocket and brought out a shiny object. Johnson was also struggling with Cupcake. Dixon ducked down and heard a shot. Dixon left the tavern at this point. As he did so he saw Boyd lying halfway in the door with some object between his hands.

Defendant testified that he arrived at the tavern about 5 or 5:30 p.m. Cupcake, whom he had known for 10 years, arrived at about 6 p.m. Boyd and Johnson arrived at about 8 p.m. As defendant was sitting at the bar he heard Cupcake say "Help, they got a gun. Don't let them shoot me. Help, help, they're sticking me up." Defendant saw that Cupcake was being held against the wall by Johnson while Boyd held a knife to Cupcake's neck. Defendant moved towards them with his pistol in his hand and ordered them to "freeze." Boyd let Cupcake go and turned toward the defendant. He raised his arm in the air and began to bring the knife down on defend-

ant's head. From a distance of three or four feet defendant crouched and fired his pistol at the victim. Defendant testified that he fired out of fear for his life and that of his friend. After he fired defendant saw that Johnson and Cupcake were still struggling on the floor. At gunpoint he forced Johnson to take a pistol out of his pocket. Cupcake took the pistol and he and the defendant separately left the tavern. As defendant left he saw Boyd on the floor by the door with a knife in his hands. Defendant testified that after his arrest he told police he shot Boyd in self-defense and to save his friend.

Fabian Marshall, who had known defendant for about 15 years and Cupcake for about four years, testified that from his position in the back of the tavern he heard Cupcake shout "he's got a gun." A scuffle had broken out between Cupcake, Johnson, and Boyd. Marshall dived to the floor and crawled behind the bar, where he saw the bartender, Jackson, also on the floor. At this time he heard shots fired but was unable to see who fired them.

## (1)

We find no merit to defendant's contention that this evidence was insufficient to establish his guilt beyond a reasonable doubt. It was undisputed at trial that defendant shot the victim; the question for the jury was whether this shooting was in self-defense. The jury was presented with two basic versions of what occurred. State witness James Jackson testified that Boyd and Johnson entered the tavern together, a fight broke out in the rear of the tavern between Johnson and Cupcake, and Cupcake called out for help to the defendant, saying that Johnson had a gun. Boyd, who was standing near defendant and 20 feet from the fight, attempted to leave the tavern. Defendant then shot Boyd, who according to Jackson had no weapon in his hand, in the back of the neck.

Defendant's version was that he came to the rescue of Cupcake, who was being robbed by both Boyd and Johnson. Boyd held a knife to Cupcake's neck as defendant approached with a gun. Boyd then turned toward defendant and began to bring the knife down toward his head. At this point according to defendant he shot Boyd in self-defense. As defendant left the tavern he observed the knife still in Boyd's hands as he lay on the floor. This version was largely corroborated by defendant's other witnesses. Cupcake also testified that he struggled with Johnson and Boyd, who held a cold object to his neck. Cupcake called for help, defendant approached, Boyd attempted to go around Cupcake and then after a shot was fired Boyd was no longer "on" Cupcake. Dixon also recalled that Cupcake struggled with Johnson and Boyd. He saw Boyd take a shiny object from his pocket before the shot was fired and afterward saw Boyd on the floor with an object in his hands. Marshall recalled Cupcake strug-

gling with Johnson and Boyd. He also testified that Jackson was on the floor behind the bar when the shots were fired and thus presumably unable to see who fired them.

It was the jury's function to determine the credibility of these witnesses and to sort out the conflicting testimony. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Certainly one important factor in their consideration was the physical evidence that the victim was shot in the back of the neck, a fact tending to discredit defendant's claim that the victim was shot as he was attacking defendant. The jury chose to believe the testimony of Jackson, as corroborated by the physical evidence. We find no basis for disturbing their determination.

(2)

Defendant also contends that the trial court erred in denying his motion for a new trial based on newly discovered evidence. Defense counsel's affidavits in support of this motion stated that counsel had located Larry Johnson one day after the jury returned its guilty verdict. According to the affidavits Johnson told counsel that he and Boyd were involved in a fight with Cupcake at the tavern. Boyd had a knife during the fight and Johnson saw Boyd strike out at defendant with the knife. Counsel further stated in the affidavits that he attempted to interview the witness on three occasions between October 10, 1975, and May 17, 1977, at the address for Johnson furnished by the State but was unable to locate him there. Johnson told him he had been in Cook County jail under the name of Robert Smith since December 1976 or January 1977. He also told counsel he had never lived at the address given by the State in its answer to discovery. After hearing arguments on the motion the trial court denied it, finding that the evidence would only be cumulative.

As was stated in *People v. Torres* (1977), 47 Ill. App. 3d 101, 106, 361 N.E.2d 803, 807:

"To award a new trial [on the basis of newly discovered evidence], the new evidence must be of such a character that it will probably change the result on retrial, must be material to the issue and not merely cumulative, and must be of such a nature that it could not have been discovered prior to trial by the exercise of due diligence."

In this cause we find that counsel in the first instance failed to demonstrate such due diligence as would support his motion. The existence of the witness and the role he played in the occurrence were known to counsel from the outset. Yet from September 3, 1975, when counsel stated he received the State's answer to discovery, until July 8, 1977, when defendant was convicted defense counsel's only attempts to locate this witness were by three visits to the same address. Counsel apparently made no investigation with postal authorities, the telephone company, or even with the State to ascertain if a new address was available. Nor did counsel

at any time seek a continuance for the purpose of locating the witness.

■■ But even had counsel demonstrated sufficient diligence in attempting to locate the witness, we find, as did the trial court, that the evidence ultimately discovered was only cumulative and therefore insufficient to support the motion for a new trial. Defendant's testimony concerning the shooting was corroborated by his other witnesses, as we have noted in summarizing the evidence. Defendant testified that Boyd attacked him with a knife after defendant intervened in a fight between Cupcake and Boyd and Johnson in which Boyd first threatened Cupcake with the knife. Cupcake himself testified that Boyd held a cold object, possibly a knife or gun, to his neck and then attempted to move around him as defendant approached. A shot was fired and Boyd was no longer "on" him. Dixon and Marshall both testified that, contrary to James Jackson's account, both Boyd and Johnson struggled with Cupcake. Dixon saw Boyd take a shiny object from his pocket, heard a shot, and later saw Boyd on the floor with an object in his hands. The testimony of Johnson thus would have been cumulative of the evidence defendant was able to present.

In *People v. Holtzman* (1953), 1 Ill. 2d 562, 569, 116 N.E.2d 338, 342, our supreme court spoke of the heavy burden borne by a defendant seeking a new trial on the ground of newly discovered evidence:

> "Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and that there has been no lack of diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse."

We find that defendant failed to meet this burden in this cause and we find no abuse of discretion in the trial court's denial of the motion for a new trial based on newly discovered evidence.

(3)

We next consider defendant's contention of improper cross-examination and rebuttal evidence by the State concerning narcotics involvement by defense witness Cupcake. During direct examination Cupcake testified that after the shooting he was taken into police custody and questioned. Cupcake testified that during this questioning he was beaten by the police and thus coerced into changing his story:

"[Defense counsel]: What did you say then?

[Cupcake]: I began to tell them again, I say 'The guy came in

there. He told me he got his friends outside. They were trying to sell a lady's diamond ring, and just at that point I got knocked out the chair on the desk and I just wet all over myself and they just had a good time with me that night. They just whupped me.'

[Defense counsel]: At any time did you change the statement you gave?

[Cupcake]: Yes. After that time he say, 'Wasn't it about dope. Yeah, it was, anything, but when I get to court I'll say what I got to say.' "

On cross-examination the State asked Cupcake if he recalled telling Officer James Griffin that he was going to sell narcotics to Boyd and Johnson at the tavern. Cupcake answered no. The State later called Officer Griffin as a rebuttal witness. Over defense objection Griffin testified that Cupcake told him he had planned to sell narcotics to Boyd and Johnson. Griffin also testified that he did not see any police officer strike Cupcake.

■■ Defendant contends that the sole purpose of presenting this evidence was to undermine Cupcake's credibility by presenting to the jury evidence that Cupcake was involved in criminal activity. But in fact it was the defendant's witness Cupcake who first received this issue by testifying on direct examination that the police beat him and forced him to tell them that the transaction was about "dope." We find no error in the court then permitting the State to impeach the witness on this point by eliciting evidence that he was not beaten and had voluntarily made the statement about narcotics. The scope of cross-examination is within the discretion of the trial court and will not be disturbed absent evidence of abuse of that discretion. *People v. Leyva* (1977), 47 Ill. App. 3d 53, 361 N.E.2d 763.

### (4)

Finally defendant contends that he was deprived of a fair trial by the State's comments and insinuations, during closing argument, that defense witness Donald Cupcake and the defendant were drug dealers.

No such references were made in the initial closing argument by the State. It was defense counsel in his closing argument who first brought up the subject of possible drug involvement by Cupcake, stating:

"Now, don't you think it's reasonable talking about nonesense [*sic*]. Cupcake is at the station and he confessed to selling narcotics, or delivering narcotics and Larry Johnson was there and he was supposed to be the purported buyer. Don't you think they would charge that man? They held him until after he gave the statement, but Cupcake said he went home by himself. They didn't talk to him anymore after that.

Didn't it seem reasonable that you have a narcotics seller and let him go, is that protecting the public? What was the purpose of having

that man there? You are not going to keep him there, get him off the street if he is a narcotics pusher, if he is a menace to society. What were the reasons? They didn't give you any reasons, no sufficient evidence to put a man on trial."

Later counsel ended his argument by discussing the testimony of the bartender, James Jackson:

"Even from the testimony of Mr. Jackson, the bartender, it [defendant's version] is unrefuted because he told you at the end of his testimony that he didn't know what happened because he wasn't paying attention. I submit to you, ladies and gentlemen, he wasn't paying attention all the time because he was on the floor like everybody was. He was reasonable. He was on the west side of Chicago where it is not uncommon finding people with weapons.

[The State]: Objection.

The Court: This is argument. It is not evidence.

[Defense Counsel]: And do everything else to prevent you from harm. You must judge the defendant as to his reasonableness when he acted. You must ask yourselves and put yourselves in his position. You must ask yourselves was it reasonable for him to act like that or to maim someone if he feels his life is in danger under the circumstances. * * * You cannot put the defendant in your cultural background. You must place him on west Madison at the Monkey Club Lounge. At this lounge there are pool hustlers, stick-up men, pool sharks, and I suppose dope pushers and dope addicts. This is where life is cheap. This is where you must put him. You must judge him, did he act reasonable under those circumstances."

It was in apparent response to these arguments that the State made the comments in rebuttal from which defendant now claims prejudice. In two of the three instances the State stated that Cupcake had admitted to the police that he was a drug seller:

"Now, we have Mr. Donald Cupcake testifying before you. Well, Counsel tries to make a big point of saying that if he was a dope dealer, whey [sic] wasn't he charged with the offense? The only evidence that the police have—

[Defense Counsel]: Objection.

The Court: This is argument.

[The State]: He told the police he was there to sell dope. That is the only evidence the police had. A big point is made of Donald Cupcake not being arrested. What is there to charge him with.? Donald Cupcake, go take a look at him. Doesn't he look like a dope dealer? His three inch velvet platforms. He was really pretty. Donald got up and was telling you a story. In Donald's story Donald makes himself seem like an innocent victim of a crime."

At the end of the argument the State commented:

> "Counsel will have you believe that [defendant] is a hero shooting somebody in protection of another person, shooting somebody in the defense of another, somebody as poor as Donald Cupcake. Look at the defendant in his three piece suit, shirt, and tie. That is not the same James Patterson who was sitting in the Monkey Club Lounge on March 20th.
>
> [Defense Counsel]: Objection.
>
> The Court: This is argument. * * *
>
> [The State]: He is not the same James Patterson who was sitting in the Monkey Club Lounge with a gun in his pocket. His body [sic], Donald Cupcake, admitted to the police that he sells dope. He certainly isn't as clean and poor as he looked." ·

■■■ These comments were improper in that they were not based on facts in evidence or on reasonable inferences drawn from such facts. (*People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280; *People v. Burnett* (1963), 27 Ill. 2d 510, 190 N.E.2d 338.) What Cupcake did say on direct examination was that after being severely beaten by the police he told them that the fight was "about dope," although in fact he maintained that the fight occurred when a gun was pulled on him during a discussion about buying a ring. The State adduced evidence that no beating occurred. They also impeached Cupcake's testimony by adducing evidence that, contrary to his denials on cross-examination, he told the police voluntarily that he had planned to sell narcotics to Boyd and Johnson. This impeachment evidence of prior inconsistent statements could not in itself be properly used as substantive evidence that Cupcake did plan to sell narcotics at the lounge. (*People v. Collins* (1971), 49 Ill. 2d 179, 274 N.E.2d 77.) However, to the extent it affected Cupcake's credibility the jury could have chosen not to believe his account of being beaten into making the statement about drug involvement, while still believing that he did make the statement, as he had testified on direct examination. A jury is not required to accept or reject testimony of any witness in toto; it may choose to believe only a portion of that testimony. (*People v. Warren* (1965), 33 Ill. 2d 168, 210 N.E.2d 507.) Thus the State did have an evidentiary basis for suggesting that Cupcake had been involved in a drug transaction, but they improperly went beyond this in relying on impeachment testimony to state that he was actually the seller. However the question of whether improper arguments prejudiced a defendant must be examined in the context of the entire argument and the entire record. (*People v. Hoggs* (1974), 17 Ill. App. 3d 67, 307 N.E.2d 800.) Only when the remarks in issue resulted in substantial prejudice to the defendant is reversal required. (*People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) In the context of this trial, where it was the defendant who first raised

the question of possible narcotics involvement in direct examination of one of his witnesses, and who again first raised the issue in final argument, we find that the remarks of the State, although improper, were not such as to require reversal.

■■ The other comments from which defendant claims prejudice were made in apparent response to defense counsel's final argument, which we have quoted, in which he sought to explain why defendant was armed at the tavern. The State responded:

> "[P]eople on the west side carry guns. People carry them all the time. There are robberies. People deal dope out at a bar like the Monkey Club Lounge. It is not a good area. The testimony of the defendant was that he left his home about 4:30 and came back at 5:00. And when he came back is when he took the gun with him. And where did he go? He went to the Monkey Club Lounge. People that are dealing dope are going to carry guns because they might get ripped off. People dealing with drugs, a person who is selling drugs has somebody hanging around with him. Cupcake and Johnson were there to deal drugs.
>
> [Defense Counsel]: Objection.
>
> The Court: The jury is to disregard the remark."

Clearly it was improper for the State to infer that because defendant armed himself before going to the tavern where his friend Cupcake arguably admitted involvement in a drug transaction, defendant was also involved in dealing drugs. But defense counsel's objection was upheld and the jury was instructed to disregard the remark. This has been held sufficient to cure the error caused by an improper remark. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) Moreover, it was defense counsel who invited this remark by suggesting that defendant was carrying a gun because of the sort of people populating the bar, people who he indicated might include drug pushers and drug addicts. Ordinarily a defendant cannot complain that he has been prejudiced by a prosecutor's remarks where they are in response to comments made by defense counsel. (*People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382.) Under these circumstances we find no prejudice resulting from these comments such as would require reversal of defendant's conviction.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.