THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
VALENTE BURNETTE (Impleaded) *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 80-489, 80-885 cons.

Opinion filed June 25, 1981.

Robert B. McGee, of Chicago, for appellant Valente Burnette.

James J. Doherty, Public Defender, of Chicago (Clifford G. Kosoff and Timothy O'Neill, Assistant Public Defenders, of counsel), for appellant Paul Villagomez.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Defendants, Valente Burnette, Paul Villagomez and Enrique Lopez, were charged with the offense of murder of Robert Salcedo (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(1), 9—1(a)(2)), attempt murder of Alfredo Morales (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(a)), and armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2). The cases were consolidated for trial, with Burnette and Villagomez receiving a jury trial and Lopez receiving a bench trial. The jury returned a verdict of guilty of murder and armed violence against Burnette and Villagomez. Lopez was found not guilty in his bench trial. Burnette and Villagomez were sentenced to concurrent terms of 30 years for murder and 20 years for armed violence. The defendants raise the following issues for review: (1) whether the State failed to prove them guilty beyond a reasonable doubt; (2) whether the court erred in denying their motion to instruct the jury on the lesser-included offense of involuntary manslaughter; (3) whether the court erred in admitting hearsay evidence; (4) whether the court erred in denying their motion for mistrial on grounds that the prosecutor waved before the jury transcripts of witnesses' testimony and argued that the transcripts were full of prior consistent statements; (5) whether the conviction and sentence for armed violence should be vacated because it is a lesser included offense of their conviction and sentence for murder; and (6) whether the court erred when it allowed the prosecutor to impeach a defense witness with a prior juvenile adjudication of delinquency.

We affirm the judgment and sentence for murder. We reverse and vacate the judgment and sentence for the offense of armed violence.

On December 1, 1978, at approximately 10 p.m., Ruben Salcedo, brother of the deceased victim, and Alfredo Morales, brother-in-law of the deceased victim, drove to 18th Street and Ashland Avenue, in Chicago, for the purpose of giving Robert Salcedo, the victim, a ride home. They found Robert with several other people in a garage in the alley south of 18th Place. Robert asked his brother to give Ivan's car a battery jump. Ivan was among the people in the garage. The car, a yellow Colt, had stalled, double-parked, in front of 1532 West 18th Place. Rubin agreed to do so. As Rubin and Alfredo re-entered their car to circle the block, Robert, Ivan and Amador Covarrueies walked to the front of Amador's house where the yellow Colt had stalled.

Rubin testified that he drove east to Laflin, turned left in a northerly direction to 18th Place, and turned left, westbound, onto 18th Place. After turning onto 18th Place, he saw two double-parked cars. The car to his left, parked on the south side of 18th Place, was a dark greenish-blue

Pontiac. It was facing east. As Rubin and Alfredo passed the vehicle, they saw defendant Villagomez in the driver's seat and defendant Burnette in the passenger seat. The car to Rubin's right, on the north side of 18th Place at the mouth of the alley, was a red Ford Maverick. Rubin saw several people in the Maverick but identified only one—defendant Enrique Lopez as the person seated in the driver's seat. Because the streets were slippery due to ice and snow, Rubin drove 2 to 3 miles per hour as he passed between the cars. Rubin proceeded west on 18th Place to the next alley, made a left turn, backed out and returned east to bring his car nose-to-nose with the stalled yellow Colt.

Rubin Salcedo testified that he was able to see defendants because there was a bright street light directly above the cars. In addition, Rubin had previously known defendant Burnette by the name, Val. He had known defendant Villagomez as a friend of his brother, Robert.

Further testifying, Rubin stated that he and Alfredo exited the car and joined Robert, Ivan, Amador and a girl named Norma around the stalled car. They heard someone shout, "I think they're going to shoot!" Rubin and Alfredo both testified that they saw Burnette and Villagomez get out of the car and drop into a crouch position. Each saw flashes coming from the direction of the greenish-blue car. Each saw Burnette and Villagomez with their arms extended. They testified that Robert Salcedo fell wounded in the street. They tried to reach the victim but were hindered by shots. Rubin testified that he called out, "Deputy Sheriff, halt!" But, the shooting did not stop. Thereafter, Rubin fired toward the greenish-blue Pontiac. He further testified that shots then came from the direction of the red Maverick.

When Rubin and Alfredo were able to reach the victim and pull him between the cars, Rubin said he noticed that his brother's face was covered with blood and that there was a bullet hole on the left side of his head. Rubin and Alfredo placed the victim in Rubin's car. Rubin put the car in reverse and backed down the street. He drove to the University of Illinois hospital. Dr. Shaku Teas testified that on December 2, 1978, she performed an autopsy on Robert Salcedo. Death was caused by multiple gunshot wounds.

Jennie Cardenas of 1529 West 18th Place testified that on December 1, 1978, between the hours of 10:30 to 11:30 p.m., she had raised the window abutting the fire-escape outside her second floor apartment in preparation for decorating the window and fire escape with Christmas lights. Cardenas testified that she noticed a yellow car stalled in front of her house near the middle of the street. Her house was across the street from Amador Covarrueies, a neighbor she had known for 4 years. Cardenas said that when she looked east toward Laflin she saw a dark-colored car and two men standing in the street. The men each held a black

object which reflected the street light, and which they pointed toward the yellow car. She heard gunfire and saw flashes coming from the objects held by the two men. Cardenas identified the two men as defendants Burnette and Villagomez. She had known Villagomez for approximately 10 years and had known Burnette as Val for about 1 year. Cardenas further testified that as the car carrying the victim away backed down the street the two men walked west toward the yellow car and continued to fire. The witness stated that she left the window to quiet an awakened baby. When she returned to the window, she saw the parents and sister of Villagomez on the street. She heard Villagomez' mother yell in Spanish, "Run, run and hide." The statement was admitted over objections of the defense.

Antoinette Cardenas, sister of Jennie, testified that she was in the living room of her second floor apartment at a window adjacent to where Jennie stood. She observed the events as described by her sister. She also identified the defendants. She heard and testified, over defense objections, that the mother of Villagomez shouted in Spanish, "Run, run and hide." Thereafter, the witness testified, she left the window and telephoned the police.

During defendants' case in chief, Jessie Velasco, a juvenile, testified as to the events of December 1. He had been with the defendants most of the evening. Velasco testified that he did not have a gun nor did he see guns in the possession of defendants. Velasco suffered a bullet wound as he ran east toward Laflin. On cross-examination, the State impeached Velasco with a prior juvenile adjudication of delinquency. The State asked the witness whether he had been convicted of murder. Defendants claim error and that the acts of the prosecutor inured to their prejudice.

Defendants Burnette and Villagomez testified. Both denied having guns and shooting Robert Salcedo. They admitted that they were in the area, that they had spent 4 or more hours riding in a dark-green car owned by a friend of Villagomez, and that the friend had taken them to 18th Place where Lopez had parked the red Ford Maverick. Neither knew how the shooting started or from which direction the shots came. When they heard the shots, they ducked behind the Ford Maverick and ran.

Burnette and Lopez, with the aid of the driver of the dark green car, took the wounded Velasco to the University of Illinois hospital. Velasco, Burnette and Lopez were identified at the hospital by Rubin Salcedo. Villagomez was arrested 1 month following the incident. He had left the city because he knew the police were looking for him.

The jury found defendants Burnette and Villagomez guilty of murder and armed violence. Following arguments in aggravation and mitigation, both defendants were sentenced to concurrent terms of 30 years imprisonment for murder and 20 years for armed violence.

Defendants contend the State failed to prove guilt beyond a reasonable doubt. Proof beyond a reasonable doubt does not require proof beyond the possibility of doubt. (*People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801, 804.) The trier of fact may consider inferences drawn from the evidence and is not required to raise to the status of reasonable doubt possible theories compatible with innocence. *People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382, 384.

Defendants were identified as being at the scene by four credible witnesses. Each witness testified that they saw flashes coming from objects held by the defendants. All the occurrence witnesses testified that more than 30 shots were fired. And, Robert Salcedo died from multiple gunshot wounds. Defendants did not deny being at 18th Place. They have denied having guns in their possession and having any knowledge of the origin of the shooting. Where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made. *People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631, 634.

It would appear that the jury chose to believe the four witnesses, Salcedo, Morales, and the Cardenas sisters, as to the events of December 1, 1978. This court may not disturb the result reached by the trial court unless it is contrary to the manifest weight of the evidence. See *People v. Davis* (1977), 53 Ill. App. 3d 424, 430, 368 N.E.2d 721, 726.

Defendants claim the court committed reversible error when it refused to instruct the jury on the lesser included offense of manslaughter. We do not agree. Instructions on involuntary manslaughter and reckless homicide cannot be given unless there is evidence in the record to support them. *People v. Dewey* (1969), 42 Ill. 2d 148, 246 N.E.2d 232.

Defendants claim their acts were indicative of recklessness. Such a claim was made by the defendant in *People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829. In *Cannon*, the defendant shot into a group of boys playing on a playground. Later the defendant testified that he did not intend to kill anyone. The court held that his testimony was not a sufficient basis for giving an instruction on involuntary manslaughter. He intended to fire the gun; he pointed it and shot in the decedents' general direction. This act done voluntarily and willfully was sufficient evidence of the intent requisite to constitute the offense of murder. *Cannon*, at 166.

■■ The crux of the offense of involuntary manslaughter is recklessness. (*People v. Simpson* (1978), 74 Ill. 2d 497, 504, 384 N.E.2d 373, 376.) A defendant is entitled to manslaughter instructions if the record establishes a basis for them, irrespective of the source of the requisite evidence. (*Simpson*, at 504.) The record shows that Burnette and Villagomez were

identified as the men who crouched, took aim and fired in the general direction of Robert Salcedo. It cannot be concluded that the act of deliberately firing into a crowd is merely reckless.

Hearsay evidence is testimony in court or written evidence of a statement made out of court. Such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter. *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741, citing McCormick, Law of Evidence §225 (1954), and Cleary, Handbook of Illinois Evidence §13.1 *et seq.* (1956).

The distinction between admissible testimony and that which is barred by the hearsay rule is well illustrated by Wigmore's example of the witness A testifying that "B told me that event X occurred." If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible—if offered to prove that event X occurred, it is clearly inadmissible, for the only probative value rests in B's knowledge, and B is not present to be cross-examined. *Carpenter*, at 121.

The Cardenas sisters testified that the mother of defendant Villagomez shouted in Spanish, "Run, run and hide." This statement was admitted over defense objections. The defense contends that the purpose of the statement was to show that the defendants had reason to flee and hide. The State counters that the statement was offered merely to show that the statement was made and not to establish that the mother had witnessed the circumstances of the shooting.

■■ We agree that the statement was not offered to prove any fact in issue.

Defendants claim the judge should have declared a mistrial because the prosecutor waved a transcript of testimony and argued that the transcript was full of prior consistent statements.

The prosecutor may note in closing argument that the testimony heard from the witness stand is unrebutted and uncontradicted. Such comment on the uncontradicted nature of testimony is a permissible summary of the evidence. See *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, 284 N.E.2d 283, 285-86; *People v. Yancey* (1978), 57 Ill. App. 3d 256, 264, 372 N.E.2d 1069, 1075; *People v. Summers* (1977), 49 Ill. App. 3d 70, 77-78, 362 N.E.2d 1347, 1354.

The court in *People v. Patterson* (1980), 88 Ill. App. 3d 878, 886-87, 410 N.E.2d 1115, 1121-22, noted that whether an improper argument prejudiced a defendant must be examined in the context of the entire argument and the entire record. A defendant cannot complain that he has been prejudiced by a prosecutor's remarks where the remarks are in response to comments made by defense counsel.

In closing argument, defense counsel pointed out that there was contradictory testimony which had been brought out on cross-exami-

nation. But counsel did not identify which witness or what fact had been contradicted.

In rebuttal, the prosecutor attacked the statement. The prosecutor asserted that out of 104 pages of testimony taken of Rubin Salcedo, defense counsel read 7 pages that contained contradictory statements. Defense counsel objected as there was not evidence on the number of pages of transcript or on what was contained in the transcripts. The objection was sustained as to the number of pages. Defendants contend the prosecutor's remarks raised an inference that the pages of the transcript not used for impeachment were consistent with the witnesses' in-court testimony.

■■ No reversible error results from final argument unless the argument constituted a material factor in the conviction, or resulted in substantial prejudice to the accused, or the verdict would have been different had the improper closing argument not been made. (*People v. Smith* (1977), 53 Ill. App. 3d 395, 403-04, 368 N.E.2d 561, 567-68.) Though it was error for the prosecutor to refer to the transcript and wave it before the jury, we do not think these acts or remarks rise to the level of reversible error.

Defendants contend their conviction and sentence for armed violence should be vacated as it is a lesser included offense of their conviction and sentence for murder and arose out of the same act. We agree.

Where the same physical act constitutes two or more offenses, it is proper to enter a judgment of conviction and sentence only on the most serious of the offenses. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Sass* (1979), 73 Ill. App. 3d 554, 392 N.E.2d 399.) There must be a single physical act (*People v. King*) and one conviction of crime as to each victim (*People v. Cazares* (1980), 86 Ill. App. 3d 612, 408 N.E.2d 258). But, the conviction and sentence should only be to the greatest offense charged. *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 1023, 356 N.E.2d 891, 898.

The court in *King*, at page 561, construed section 1—7(m) of the Criminal Code of 1961 with the committee comments as prohibiting the imposition of concurrent sentences when the offenses result from the same conduct. The term, "conduct" was used in the sense of "same transaction." A single physical act was construed to mean an overt or outward manifestation which would support a different offense. (*King*, at 566.) Prejudice would result to a defendant only in those instances where more than one offense was carved from the same physical act. *King*, at 566.

An included offense has been interpreted as a lesser included offense only if the greater offense charged contains all of the elements of the lesser included offense plus some additional elements. *People v. Howard*

(1979), 78 Ill. App. 3d 858, 862, 397 N.E.2d 877, 881; *People v. Kahl* (1978), 63 Ill. App. 3d 703, 708, 380 N.E.2d 487, 491.

■■ Armed violence consists of committing a felony while armed with a dangerous weapon. (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2.) The charge of armed violence was based on the greater felony of murder. Both charges arose from the same act, that of shooting Robert Salcedo with a gun. Moreover, elements of proof of armed violence are included in proof of the elements of murder. Thus, the conviction and sentence for the lesser of the crimes arising from the same conduct should result in a reversal of both the conviction and the sentence imposed as a result of the lesser crime. *People v. Leggett* (1971), 2 Ill. App. 3d 962, 964, 275 N.E.2d 651, 653.

Defendants claim the trial court committed error in allowing the prosecutor to impeach Jessie Velasco with a prior juvenile adjudication. Though defendants admit that the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—1 *et seq.*) has not barred the use of juvenile records in certain situations (see *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852), defendants contend that use of juvenile records should be allowed only when the minor witness is testifying for the prosecution. We cannot agree to such a narrow application of the *Norwood* exception.

Records of juvenile proceedings have been used in aggravation and mitigation to allow a trial court to render a proper disposition in subsequent criminal matters where the defendant is no longer subject to the jurisdiction of the juvenile court. (*In re Mareno* (1976), 43 Ill. App. 3d 556, 558, 357 N.E.2d 592, 593.) Records of a juvenile co-defendant who is testifiying against the defendant have been discoverable and admissible to show bias. (*People v. York* (1975), 29 Ill. App. 3d 113, 120, 329 N.E.2d 845, 850.) And, records of juvenile proceedings have been made available to other governmental agencies. See *People ex rel. Burgess v. Urbana* (1975), 33 Ill. App. 3d 623, 388 N.E.2d 220.

The cases following *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852, stress that the scope of cross-examination of a juvenile witness is within the discretion of the trial court. The court must balance the importance of the minor's testimony against the State policy of preserving the anonymity of a juvenile offender. See *People v. Bingham* (1979), 75 Ill. App. 3d 418, 394 N.E.2d 430; *People v. Holsey* (1975), 30 Ill. App. 3d 716, 332 N.E.2d 699.

Defendants have not shown that the prosecution asked an improper question while impeaching Velasco. (See *People v. Gibson* (1971), 133 Ill. App. 2d 722, 272 N.E.2d 274; *People v. Garcia* (1967), 90 Ill. App. 2d 396, 232 N.E.2d 810.) Nor have defendants shown how the impeachment of Velasco has resulted in prejudice to them. Defendants contend that

because of introduction of the juvenile background of Velasco the jury was deprived of the opportunity to apply proper weight to Velasco's testimony.

■■ On reviewing the record, we do not find that Velasco's testimony substantially differed from the testimony of Burnette and Villagomez. The weight of the evidence and the credibility of the witnesses are within the province of the jury. (See *People v. Mills* (1968), 40 Ill. 2d 4, 19, 237 N.E.2d 697, 705.) We will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt. *Mills*, at 19.

For the foregoing reasons, we affirm the judgment and sentence for murder. We reverse and vacate the judgment and sentence for the offense of armed violence.

Affirmed in part; reversed in part.

ROMITI, P. J., and JIGANTI, J., concur.