THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRIS CIAVIRELLI, Defendant-Appellant.

First District (5th Division)   No. 1—90—2386

Opinion filed May 6, 1994.

Rita A. Fry, Public Defender, of Chicago (Beth I. Solomon and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Ann L. Benedek, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

NATURE OF THE CASE

Following a jury trial in the circuit court of Cook County, defendant, Chris Ciavirelli, was convicted of second degree murder. Defendant appeals his conviction and his sentence of 13 years in the Illinois Department of Corrections.

FACTS

At approximately 12:30 a.m. on September 24, 1988, a group of 8 to 12 young men (hereinafter the group) left a party on Cicero Avenue near Milwaukee Avenue in Chicago. The group included some members or former members of a gang known as the Simon City Royals (Royals), some members of the Avers Boys Organization (ABO), a gang friendly to the Royals, and some young men who were not members of any gang. The group walked together down Milwaukee Avenue toward the home of one of the men, William O'Dell, who lived east of Pulaski Avenue. The area west of Pulaski, where the party was located, is reputed to be the "territory" of the Gaylords gang, rivals of the Royals. Because some of the men carried open beer cans, the group left Milwaukee Avenue and walked eastward down side streets through what was considered Gaylord territory. Several of the witnesses testified that as they walked the group was split into two smaller subunits of approximately equal size, separated by a space of 25 to 50 feet.

Defendant and a tall, blond-haired man were on the front porch of a home at 4040 W. Roscoe, on the northeast corner of Roscoe and Karlov, as the group approached on the opposite side of the street. Apparently, all of the first subunit and some of the second subunit crossed to the side of the street where defendant was. The others remained on the opposite side of the street. At trial, four of the men in the group testified to the events which followed.

Bruce Williams, formerly a Royal, testified that as he and other members of the group neared the house, he heard cursing and the exchange of gang words between two men on a porch and certain men in the group which he did not name. One of the men on the porch was approximately 5 feet 9 inches tall, dark haired, and weighing about 160 pounds (identified as defendant), and the other man was about 6 feet 3 inches tall with long blond hair. The men on the porch yelled something about the Gaylords. Some of the men in the group, including Taek Su Chi, stood on the sidewalk in front of the porch, at which time Taek Su Chi threw a half-empty beer can which hit defendant in the face. Defendant then started shooting "randomly at anyone" in the group, firing about six shots altogether. The group scattered and defendant went inside the house. Williams and John Morris fled together down the alley.

John Morris, also a former Royal, testified that as he and the others approached, he heard "gang slogans being said back and forth," the men on the porch yelling "Gaylords" and "Royal Killers." His view was partially blocked by bushes. He saw defendant and another man standing on the porch, defendant with a jacket over his

wrist. Defendant "drew the right arm to the jacket and then brought it straight out and just started firing at random into the crowd." He did not see a beer can thrown.

William O'Dell and Taek Su Chi both testified that, as they approached Roscoe and Karlov, the defendant and a blond man yelled "almighty Gaylords" while they were standing on the porch. Defendant had a jacket draped over one arm. O'Dell stated that defendant "started reaching for something under his jacket and then he started shooting when someone threw something at him." O'Dell said he thought the object thrown was a beer can which hit defendant. Defendant then stumbled back as he pulled the gun, extended his hands in a shooting position, and shot four or more times, pointing the gun first in one direction, then at O'Dell. A bullet went through O'Dell's jacket, although O'Dell was not injured.

Taek Su Chi, an ABO member at the time of the shooting, testified he was in the front subunit. As he walked to the sidewalk in front of the porch, he saw defendant reach under a white jacket which was draped over his arm. He then threw a beer can at defendant. Defendant then stepped back and started shooting, pointing the gun at Chi and then "into the crowd," firing "around four, five shots."

All of the foregoing witnesses testified that no one in the group carried a weapon that night. They each ran to O'Dell's house when the shooting started. There, O'Dell called the police for an ambulance on behalf of one of their companions, Oscar Martinez, who had been shot.

All four men made in-court identifications of defendant as the dark-haired man on the porch who shot the gun. The tall blond man on the porch was never identified in the record.

Officer Rutherford of the Chicago police department testified that as he and his partner drove to the 4000 block of Roscoe to answer a radio call of a man shot, their car was flagged down one-half block from the scene of the shooting. There the officers found Michael Piazza, with a gunshot wound in his back from which he later died.

Manuel Nieves, who lived nearby, was the only witness for the defense. He stated that as he and his sister-in-law arrived home at approximately 1 a.m., they saw five or six young men running east on Roscoe toward Pulaski. He saw no weapons among this group. As Nieves and his sister-in-law crossed the street to enter their house, they saw three men come out of an alley, one a blond in a green jacket with a gun in his right hand. Nieves called the police, who then came and took him to 4040 W. Roscoe where defendant was. Nieves testified that the defendant was not the man he saw coming out of the alley with a gun.

Chicago police department detective Allen Jaglewski testified during rebuttal that he questioned Manuel Nieves that night and that Nieves then identified defendant as the man who came out of the alley with a gun. Detective Jaglewski also testified that Nieves never told him the man with the gun had blond hair.

Defendant was arrested that night and was identified in a lineup later in the day by Taek Su Chi and Bruce Williams. Defendant was charged with first degree murder and armed violence in the death of Michael Piazza and with attempted first degree murder, armed violence, and aggravated battery in the shooting of Oscar Martinez. All counts were nol-prossed except for the first degree murder charge arising from the death of Michael Piazza. After a jury trial, defendant was found guilty of second degree murder and was sentenced to a term of imprisonment of 13 years.

## OPINION

On appeal, defendant asks that his conviction be reversed and the cause remanded for a new trial based on his contention that the trial court committed reversible error by (1) refusing to admit evidence of prior violent acts by any of the men in the group; (2) refusing to instruct the jury on the offense of involuntary manslaughter; (3) prohibiting cross-examination of William O'Dell regarding possible pending violations of probation; and (4) refusing to admit a transcript of the 911 police tape recorded the night of the shooting. In the alternative, defendant contends that his sentence was excessive and asks this court to reduce the sentence or remand the cause for a new sentencing hearing.

Defendant first contends that the trial court erred in granting the State's motion *in limine* precluding the admission of evidence of prior violent acts by members of the group against members of the Gaylords, a gang to which defendant apparently belonged. The written motion is not contained in the record. However, it is apparent from the record of the oral argument on the motion that the State sought to preclude defense counsel from eliciting any evidence, either by cross-examination of State witnesses or by direct testimony of defense witnesses, to establish commission of violent acts against Gaylord members by certain prospective State witnesses.

It is also clear from the colloquy that none of the alleged prior incidents directly involved the defendant or, for that matter, the victim, Michael Piazza. Moreover, defendant did not dispute the State's contention that none of the incidents were known to defendant at the time of this occurrence on September 24, 1988.

In opposing the motion *in limine*, defendant argued that he had

subpoenaed three Gaylord members who would testify to an incident in November 1987, in which Bruce Williams, who testified for the State, and Scott Van Fleet who, with Williams, was present at the shooting on September 24, 1988, along with other Royals allegedly entered the High Ho Restaurant with baseball bats and other weapons and smashed the finger of a Gaylord gang member, James Wood. Defense counsel stated that this incident was documented in a police report which was filed, but that he was not certain whether any arrests were made or any convictions were obtained in connection with the incident. While defendant's brief asserts that Taek Su Chi was also involved in this incident, we note that the record does not so indicate.

According to the representations of defense counsel, Clemente Morales, a Gaylord, would testify to an incident in April or May of 1988 in which Scott Van Fleet, Chris Yasak, and Oscar Martinez (all present on September 24, 1988) allegedly fought with and pushed Morales. The incident involved no guns and no police report was ever filed.

Clemente Morales would also testify to an attempted shooting by Scott Van Fleet in the summer of 1988. (The date of that event was disputed by the State's Attorney, who claimed Morales had indicated the event occurred in the summer of 1989.)

In addition, defense counsel represented that he would introduce testimony involving two other acts of violence, both postdating this occurrence. According to defense counsel, Morales would testify that in December 1988, Scott Van Fleet, Chris Yasak, and other Royals drove by and Yasak shot at Morales from the car. Finally, Karl Grosse, also a Gaylord, would testify that in May 1989, "someone" in a passing car pointed a gun at him.

Defendant contends that the evidence of these incidents was essential to his claim of self-defense because it shows who the aggressor was that night. Defendant also contends that evidence of these incidents would have explained why defendant carried a gun that night and that his actions that night were otherwise reasonable.

A defendant who claims self-defense is entitled to present evidence of the victim's aggressive and violent behavior. (*People v. Seals* (1987), 153 Ill. App. 3d 417, 424, 505 N.E.2d 1107.) However, the evidence must be reliable. (See *Seals*, 153 Ill. App. 3d at 424; see also *People v. Lynch* (1984), 104 Ill. 2d 194, 200, 470 N.E.2d 1018.) In *Lynch*, the Illinois Supreme Court noted the two ways in which evidence of a victim's violent character may support a self-defense theory. The court wrote:

"First, the defendant's knowledge of the victim's violent tenden-

cies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can only consider facts one knows, however, and evidence of the victim's character is irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature ***.

Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether the defendant knew of this evidence at the time of the event is irrelevant. ***

We hold that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Lynch*, 104 Ill. 2d at 200.

See also *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 16, 414 N.E.2d 262.

■ It is obvious that the incidents could not have been relevant for the first purpose stated in *Lynch*, *i.e.*, whether defendant responded reasonably. Clearly, he could have had no knowledge of the events which postdated the shooting. With respect to those incidents prior to the shooting, defendant did not contest the State's assertion that defendant had no knowledge of those incidents as well. Thus, the incidents could not have affected defendant's state of mind at the time of the shooting. Obviously, defendant's contention that these incidents show his motivation for carrying a gun that night must fail for the same reason.

However, reliable evidence of incidents of violence, including those which postdated the shooting, might still have been relevant under the second prong of the analysis in *Lynch* to support defendant's contentions as to who was the aggressor where there are conflicting accounts of what happened.

In this case, there is no question as to who might have been the aggressor. The testimony shows only one possible aggressor other than the defendant, namely Taek Su Chi, the man who threw the beer can. Although there is some question whether defendant drew his gun before or after Taek Su Chi threw the beer can, there is no evidence indicating that any other member of the group was the aggressor. (See *Seals*, 153 Ill. App. 3d at 424 ("Before a court admits evidence of a victim's character, a defendant must provide some evidence that the victim was the aggressor").) We note from the record

that there were no representations made to the trial court that Taek Su Chi was involved in any of these prior or subsequent incidents. Therefore, those acts would have no relevance in establishing that Taek Su Chi was the aggressor. Since there is no evidence that any man who was involved in those incidents was the aggressor in the present case, any evidence of violent acts by men in the group other than Taek Su Chi would be extraneous and irrelevant, even under the second prong of the *Lynch* analysis. Based upon the foregoing, the trial court did not abuse its discretion in finding that such evidence would create a series of "mini-trials" on those incidents whose relevancy would be, at best, tenuous and tangential, diverting the jurors' attention away from the events in the present case. See *People v. Leonora* (1985), 133 Ill. App. 3d 74, 81, 477 N.E.2d 1277 (trial judge may properly consider potential that evidence, if admitted, will confuse the issues and divert the jury's attention away from the occurrence at issue).

Defendant also contends that the trial court erred in refusing to instruct the jury on the offense of involuntary manslaughter. Defendant claims testimony that defendant stumbled after being hit with the beer can and then fired randomly is sufficient evidence that defendant's conduct was reckless rather than intentional to warrant giving the instruction. Defendant further claims that the trial court's refusal to give the instruction deprived the jury of its power of lenity, its power to convict on a lesser charge, despite evidence supporting a greater charge.

An involuntary manslaughter instruction is justified where there is some evidence showing that the defendant recklessly performed acts causing death where such acts were likely to cause death or great bodily harm. (*People v. DeMumbree* (1981), 98 Ill. App. 3d 22, 25, 424 N.E.2d 73.) However, an involuntary manslaughter instruction must not be given unless there is evidence to support it. (*People v. Burnette* (1981), 97 Ill. App. 3d 1015, 1019, 423 N.E.2d 1193.) A voluntary and willful act having the natural tendency to cause death or great bodily harm is evidence of an intentional act rather than recklessness. *People v. Foster* (1987), 119 Ill. 2d 69, 88, 518 N.E.2d 82, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044.

■ Defendant's primary defense in the present case was one of justifiable homicide (self-defense). Where, as here, the evidence shows that the defendant deliberately shot at his attackers, the theories of self-defense and recklessness are mutually inconsistent. (*DeMumbree,* 98 Ill. App. 3d at 25.) In *DeMumbree*, the reviewing court upheld the trial court's refusal to give an involuntary manslaughter instruction

where the evidence showed that the defendant "intentionally and deliberately aimed and fired the shotgun at the group of men surrounding his car." (*DeMumbree*, 98 Ill. App. 3d at 25.) The court stated, "Because the theories of self-defense or defense of a third party presuppose an intention to kill or cause great bodily harm, these theories are inconsistent with the crime of involuntary manslaughter which, by definition, is evidenced by the mental state of recklessness, not intent." *DeMumbree*, 98 Ill. App. 3d at 25.

This is to be distinguished from the situation in *People v. Santiago* (1982), 108 Ill. App. 3d 787, 439 N.E.2d 984, where an involuntary manslaughter instruction was allowed where defendant, not seeing anyone near an automobile, claimed to have shot at the automobile gas tank in an effort to divert the attention of attackers, resulting in the shooting of a bystander. The court found that under the circumstances in that case, the theory of self-defense could be sustained without showing any deliberate attempt to shoot at anyone. *Santiago*, 108 Ill. App. 3d at 803.

Here, although the witnesses testified that defendant stumbled as the beer can struck him, there is no evidence that this caused the gun to accidentally discharge. Nor was any such claim made. To the contrary, the witnesses testified that defendant aimed the gun at persons in the group and fired between four and six shots into the group. Such deliberate action cannot be considered reckless. See *People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829, where the Illinois Supreme Court stated:

> "Cannon's testimony that he did not intend to kill anyone does not provide a sufficient basis for instruction on involuntary manslaughter. He intended to fire the gun and did in fact point it and shoot in the decedents' general direction. This act, done voluntarily and wilfully, is sufficient evidence of the intent requisite to constitute the offense of murder." (*Cannon*, 49 Ill. 2d at 166.)

Accord *People v. Mitchell* (1973), 12 Ill. App. 3d 960, 299 N.E.2d 472, where the defendant raised his gun in the air in an attempt to scare away a crowd of people, some of whom were beating his brother. Then he fired six shots in the direction of the crowd, aiming at no one in particular. On review the court upheld the trial court's refusal to give the involuntary manslaughter instruction. (*Mitchell*, 12 Ill. App. 3d at 965.) See also *People v. Burnette*, 97 Ill. App. 3d at 1020 ("It cannot be concluded that the act of deliberately firing into a crowd is merely reckless"); *DeMumbree*, 98 Ill. App. 3d at 25 (discussed previously).

This result is not affected by a jury's power of lenity, the power not to convict a defendant of a certain charge in disregard of uncon-

tradicted evidence and the instructions of the judge. (See *United States v. Dougherty* (D.C. Cir. 1972), 473 F.2d 1113, 1130.) Even in *Dougherty*, where the legitimacy of a jury's exercise of such a prerogative is acknowledged, the court emphasized that "the jury must feel strongly about the values involved in the case, so strongly that it must itself identify the case as establishing a call of high conscience, and must independently initiate and undertake an act in contravention of the established instructions." (*Dougherty*, 473 F.2d at 1136-37.) Thus, a jury which chooses to exercise lenity must do so in spite of the jury instructions given, not because of them. (See also *People v. Douglas* (1991), 208 Ill. App. 3d 664, 670, 567 N.E.2d 544 ("the mere reiteration, in response to a query from the jury implicating that [lenity] power, of an instruction declaring that it is to decide the case by applying the law to the facts as determined from the evidence is not outside the proper scope of the judicial function").) Therefore, contrary to defendant's bold assertion, the trial court was not required to give an involuntary manslaughter instruction solely for the purpose of providing the jury with an additional option in the exercise of lenity.

Defendant next contends that his sixth amendment right to confront the witnesses against him was violated when the trial court did not allow him to cross-examine William O'Dell about a possible potential violation of probation charges. On direct examination, the State elicited Mr. O'Dell's testimony that in March 1989 he pleaded guilty to burglary of an automobile, possession of burglary tools, and possession of a stolen vehicle. He received four years' felony probation. On cross-examination, defendant started on a line of questioning designed to determine whether he had committed any crimes which would permit the State to charge him with violations of his probation. The State objected. In a sidebar, the State presented a current rap sheet which showed no other felony convictions and, according to the State, no pending cases. Defendant's counsel admitted there were no pending charges for violation of probation, but argued that there was a misdemeanor assault arrest in March 1989 and a guilty plea to mob action in October 1989 for which the State had the authority to file a violation of probation charge, although it had not done so. Thus, defendant's counsel argued that the facts concerning these two misdemeanors could be elicited to establish that O'Dell had a motive to testify falsely. The trial court ruled that defendant could ask only whether O'Dell had "any pending cases" and whether he had been promised anything in exchange for his testimony.

When testimony resumed, defendant's counsel attempted to ask O'Dell the following questions:

"Q. William, you went on probation on March 5th, 1989?

A. I think March 3rd.

Q. And your case from March 28 for assault in 1989?"

At this point, the State objected and the court stated "Mr. Reilly, you understand my ruling, I am sure. You may ask him if he has pending cases." Defendant then asked O'Dell if there were any cases pending against him. He replied that there were none. Defendant's counsel was allowed, over the State's objection, to elicit O'Dell's testimony that he pleaded guilty to mob action in October 1989, approximately four months before his testimony. When asked whether the State moved to file a violation of probation, O'Dell responded "No." However, the State's objection to this question and answer was sustained and the jury was instructed to disregard them. On redirect examination O'Dell testified that no one from the State's Attorney's office made any promise or said anything about his probation in order to get him to testify.

The confrontation clause of the sixth amendment to the United States Constitution guarantees a defendant the right to be confronted with the witnesses against him. The essential purpose of this guaranty is to secure the opportunity for cross-examination. (*Delaware v. Van Arsdall* (1986), 475 U.S. 673, 678, 89 L. Ed. 2d 674, 683, 106 S. Ct. 1431, 1435.) " '[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " (*Van Arsdall*, 475 U.S. at 678-79, 89 L. Ed. 2d at 683, 106 S. Ct. at 1435, quoting *Davis v. Alaska* (1974), 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110.) This includes the right to inquire into the fact that the witness has been arrested or charged with a crime where that inquiry would develop matters showing the witness' bias, motive or willingness to testify for the State. *People v. Wilkerson* (1981), 87 Ill. 2d 151, 156, 429 N.E.2d 526; *People v. Winfield* (1983), 113 Ill. App. 3d 818, 830, 447 N.E.2d 1029.

"Although the scope of cross-examination is generally within the trial court's discretion, the widest latitude should be allowed the defendant for the purpose of establishing bias, motive, or interest on the part of the witness." (*People v. Robinson* (1987), 163 Ill. App. 3d 754, 781, 516 N.E.2d 1292; see also *People v. Owens* (1984), 102 Ill. 2d 88, 103, 464 N.E.2d 261; *Wilkerson*, 87 Ill. 2d at 156.) A defendant states a violation of the confrontation clause by "showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias" and thereby exposing the jury to facts from which it could reasonably draw inferences about the witness' reliability. *Van Arsdall*, 475 U.S. at 680, 89 L. Ed. 2d at 684, 106 S. Ct. at 1436.

To this end a defendant has the right to cross-examine a witness regarding pending criminal charges without first establishing that the witness was promised something in return for his testimony (*People v. Freeman* (1981), 100 Ill. App. 3d 478, 480-81, 426 N.E.2d 1220) or that any expectation of special favor exists in the witness' mind. (*People v. Perez* (1991), 209 Ill. App. 3d 457, 470, 568 N.E.2d 250.) Where the facts reasonably warrant the conclusion that the witness might be "leniency-motivated to testify against the defendant," defendant should be allowed to explore that possibility on cross-examination. (See *Freeman*, 100 Ill. App. 3d at 482; see also *Robinson*, 163 Ill. App. 3d at 781 (evidence "must potentially give rise to the inference that the witness has something to gain or lose by his testimony").) "Defense counsel is entitled to inquire into such promises or expectations whether based on fact or imaginary." *Perez*, 209 Ill. App. 3d at 470-71.

The case of *People v. Bland* (1992), 228 Ill. App. 3d 1080, 593 N.E.2d 639, is on point. In that case a sexual assault victim testified that at the time of the assault she was on probation for delivery of a controlled substance. The trial court refused to allow the defendant to inquire about a subsequent arrest for soliciting a ride where the State subsequently dropped that charge and the related charge of violation of probation. (*Bland*, 228 Ill. App. 3d at 1083.) The reviewing court held that such questioning should have been allowed because the fact that the charges were dropped "could have provided a motive to testify falsely if she believed that the charges would be reinstated if she did not testify as the State wanted her to testify." (*Bland*, 228 Ill. App. 3d at 1088.) Similarly, in *People v. Young* (1990), 206 Ill. App. 3d 789, 564 N.E.2d 1254, this court held that it was error for a trial court to preclude questioning regarding a battery charge against a State witness although the charge had been stricken with leave to reinstate. *Young*, 206 Ill. App. 3d at 808-09.

In the present case, O'Dell admitted that he pleaded guilty to the mob action charge. Although no violation of probation charge was pending, defendant should have been allowed to question O'Dell more fully as to whether the State had filed a violation of probation charge to determine whether O'Dell had a subjective belief that a violation of probation charge might be filed if he did not testify in a manner favorable to the State. See *People v. Freeman*, 100 Ill. App. 3d at 482 (even though defense counsel was permitted to inquire as to whether there was a promise in exchange for a witness' testimony, defense counsel should also have been permitted to show why a promise might have been made).

Accordingly, the trial court's restriction of cross-examination in

this area, although moderate, was nevertheless improper. However, even where the error encroaches on a constitutional right, it is not reversible where it is shown to be harmless beyond a reasonable doubt. (*Van Arsdall*, 475 U.S. at 684, 89 L. Ed. 2d at 686-87, 106 S. Ct. at 1438; *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828; *Wilkerson*, 87 Ill. 2d at 157.) In *Van Arsdall* the United States Supreme Court wrote:

"The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684, 89 L. Ed. 2d at 686-87, 106 S. Ct. at 1438.

See also *Young*, 206 Ill. App. 3d at 809.

Defendant contends that O'Dell's testimony was important because he is the only witness who testified that defendant extended his arms in a shooting position, indicating intentional action rather than recklessness. However, the record shows that the other occurrence witnesses testified that defendant pointed the gun straight out and into the crowd and, in fact, aimed at persons in the crowd, firing the gun four to six times. Thus, O'Dell's testimony was not necessary to negate the possibility that the shooting was nonintentional. Furthermore, on all major points, O'Dell's testimony is cumulative and corroborated by the testimony of the other witnesses who saw the shooting.

Defense counsel was allowed to extensively cross-examine O'Dell as to the events surrounding the shooting. On the issue of O'Dell's credibility, the jury was aware of O'Dell's earlier conviction for burglary and his subsequent guilty plea to the misdemeanor of mob action. (See *Owens*, 102 Ill. 2d at 104 (any error in prohibiting questioning on State's filing of lesser rather than greater charge against witness was harmless beyond a reasonable doubt where the jury was presented with ample impeachment evidence to judge the witness' credibility).) Defendant also testified that no promise was made in exchange for his testimony.

Regarding the strength of the State's case, we emphasize that

three other witnesses gave substantially the same account of the shooting. Defendant presented no witnesses who saw the shooting. (See *Bland*, 228 Ill. App. 3d at 1088-89 (error was harmless beyond a reasonable doubt because there was overwhelming evidence of defendant's beating the victim and testimony from an eyewitness as well as the victim).) We conclude, therefore, that the trial court's error was harmless beyond a reasonable doubt.

Next, defendant contends that the trial court erred in refusing to admit into evidence a transcript which included Manuel Nieves' call to a 911 emergency operator on the night of the shooting. Defendant sought to introduce the transcript in surrebuttal after the testimony of the State's rebuttal witness, Detective Jaglewski. Detective Jaglewski testified that on the night of the shooting Nieves identified defendant as the man he saw come out of an alley with a gun and Nieves did not tell him that the man he saw with the gun had blond hair. Defendant contends that the transcript would show that, consistent with his own testimony, Nieves told police on the night of the shooting that he saw a blond-haired man with a gun come out of the alley, accompanied by two other men.

The general rule is that a prior consistent statement is inadmissible to bolster a witness' credibility. (*People v. Clark* (1972), 52 Ill. 2d 374, 389, 288 N.E.2d 363; *People v. Davis* (1984), 130 Ill. App. 3d 41, 54, 473 N.E.2d 387.) However, there are three exceptions to the rule, all of which defendant claims are applicable in the present case. First, a prior consistent statement is admissible to rebut a charge or an inference that the witness has a motive to testify falsely or that the testimony was recently fabricated. (*Clark*, 52 Ill. 2d at 389.) A second exception allows a prior consistent statement where the statement is a spontaneous declaration. (*Davis*, 130 Ill. App. 3d at 55; *People v. Robinson* (1978), 73 Ill. 2d 192, 199, 383 N.E.2d 164.) Finally, under the rule established in *People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 374 N.E.2d 904, a prior consistent statement may be admitted where substantial doubt is raised as to whether the impeaching statement was actually made. *Rodriguez*, 58 Ill. App. 3d at 569 ("Where, however, there is doubt as to whether the impeaching statements were, in fact, made, prior consistent statements should be admitted").

The State contends that defendant has waived this argument on appeal because he failed to make an adequate offer of proof. The State asserts that no prior consistent statement is disclosed on the face of the transcript nor did defendant give sufficient information to the trial court to show how defendant would establish through the transcript, alone or in combination with other evidence, that on the

night of the shooting Nieves told police he saw a blond man carrying a gun. Moreover, defendant asserts that the transcript itself was never submitted to the trial court.

The transcript of the 911 recording is a part of the record in this case, although the record does not disclose whether the transcript was presented to the trial judge when he ruled that it could not be admitted. Whether the failure to present the transcript itself renders the offer of proof inadequate would depend on whether the offer was otherwise sufficient in demonstrating the nature and substance of the evidence so that the trial judge could determine whether the evidence should be admitted. See *Wright v. Stokes* (1988), 167 Ill. App. 3d 887, 890-91, 522 N.E.2d 308.

Although the transcript indicates police were looking for a blond man with a gun, the transcript does not establish that this information came from Manuel Nieves. The tape includes a call from Nieves during which he stated he saw "three kids" running around the neighborhood with a gun. No description is given during the call except that they were three white males. The transcript includes several radio transmissions between police officers and the dispatcher. References are made to two other emergency calls about the shooting and to "two witnesses" being taken to the scene. Later, a police officer, identified on the transcript as "1731" tells the dispatcher:

> "Yeah, we got information on the shooting we're looking for three male whites they ran south bound on Pulaski the shooter with the gun is an eighteen/nineteen year old white 5'9", 145, he's got a green army jacket and blonde hair and the other two guys are white kids the same age, blue vest and blond hair. The guy with the army jacket has got the gun."

It is not apparent from the transcript that Nieves was the source of this information. Thus, the transcript on its face does not disclose any prior consistent statement by Nieves. In submitting his offer of proof, defense counsel failed to specifically show statements on the transcript which would establish that Nieves had told police the man with the gun was a blond. Nor did defense counsel detail what witnesses would be called or specifically what their testimony would be which would, in combination with the 911 transcript, establish that Nieves had, in fact, made the prior consistent statement. A mere brief description of the transcript is not adequate where it does not show how it would be established that Nieves was the source of the statement. Because defendant failed to make an adequate offer of proof, the issue of the transcript's admissibility is waived. See *People v. Jackson* (1989), 180 Ill. App. 3d 78, 91, 535 N.E.2d 1086 (argument waived where record does not show offer of proof as to materiality of

evidence); *People v. Andrews* (1992), 146 Ill. 2d 413, 421, 588 N.E.2d 1126 (counsel must state with particularity the substance of the proposed testimony).

■ Moreover, even if we were to presume with defendant that a prior consistent statement by Nieves is inferable from the context of the 911 transcript, such statement would nevertheless be inadmissible. Defendant has failed to show that the alleged statement falls into one of the three established exceptions to the rule against admission of prior consistent statements. For a prior consistent statement to be admissible to rebut the inference of recent fabrication, the prior statement must have been made before the motive to lie came into existence. (*People v. Harris* (1988), 123 Ill. 2d 113, 139, 526 N.E.2d 335; *Clark*, 52 Ill. 2d at 389.) Although the State implied in closing argument that Nieves lied because his sister-in-law lived in Gaylord territory, the sister-in-law lived there at the time of the alleged prior consistent statement. No evidence was presented to show why this motive to lie, or any other motive to lie, existed at the time of trial, but not when the earlier statement was allegedly made.

Secondly, if the information on the 911 tape about a blond man came from a statement by Nieves, the statement did not qualify as a spontaneous declaration. In deciding whether the spontaneous declaration exception applies, a court must consider the entirety of the surrounding circumstances to determine "whether there was an opportunity for reflection and invention." (*Davis*, 130 Ill. App. 3d at 55-56.) The burden rests on the proponent of the evidence to show that there was no such opportunity. (See *People v. Coleman* (1983), 116 Ill. App. 3d 28, 34, 451 N.E.2d 973, *cert. denied* (1987), 479 U.S. 1056, 93 L. Ed. 2d 984, 107 S. Ct. 933.) It is clear from the transcript that Nieves did not refer to the man with a gun as a blond when he initially related the incident during his 911 call made immediately after seeing the men run out of the alley. If the description of the man as blond was given to police by Nieves at any time, it was later, possibly when police interviewed him. The immediacy required for a spontaneous declaration is removed by repetition or by detailed discussion of the facts. (*Davis*, 130 Ill. App. 3d at 56.) Moreover, the transcript does not reveal the circumstances surrounding the statement. Thus defendant has failed to meet his burden to show that there was no time for reflection and fabrication.

Lastly, the circumstances in this case are not sufficient to invoke the exception under *Rodriguez* that a prior consistent statement is admissible where substantial doubt is cast as to whether the impeaching statement was ever made. In *Rodriguez*, a witness testified that he was present and saw a shooting in a bar. The defense

attempted to impeach the witness by showing he had told a police officer he was in the washroom at the time of the shooting. The police officer who, although he had not spoken to the witness, prepared a report stating the witness was in the washroom was allowed to testify that he overheard the witness tell the State's Attorney that he had seen the shooting and that, in overhearing this statement, he realized that the inconsistent statement he had recorded was incorrect. (*Rodriguez*, 58 Ill. App. 3d at 569.) Thus, the police officer was allowed to refer to a prior consistent statement in order to explain how that statement caused him to recognize that the impeaching statement he had recorded was inaccurate.

In the present case, Nieves testified that he saw a blond man with a gun run from the alley. Detective Jaglewski testified that Nieves did not tell him that the man with the gun who ran from the alley had blond hair. While Detective Jaglewski's statement impeached Nieves' testimony, there was no evidence to show that Jaglewski's memory was false and inaccurate and thereby raise a question as to the existence of the impeaching evidence. For example, no one testified to being present during the conversation between Nieves and Detective Jaglewski and overhearing Nieves tell the detective that the man had blond hair. Nor did Nieves testify that he told Detective Jaglewski the man had blond hair. Unlike the situation in *Rodriguez*, where there was evidence that the impeaching statement, allegedly made by the witness, had not, in fact, been made, here there was no evidence that contradicted Detective Jaglewski's testimony. The mere fact that the impeaching statement was inconsistent with Nieves' testimony in court does not suffice for that purpose. If that alone were sufficient under *Rodriguez*, it would open the door for admission of prior consistent statements whenever a witness would be impeached by a prior inconsistent statement. Clearly, that is not the intended thrust of *Rodriguez*. See *Rodriguez*, 58 Ill. App. 3d at 569.

Finally, defendant contends that his sentence of 13 years' imprisonment, two years less than the maximum for second degree murder, was excessive. Defendant claims that the trial judge considered only the serious harm caused, but did not consider defendant's rehabilitative potential and various mitigating factors. Among the mitigating factors which defendant claims the trial court should have considered are the absence of any prior convictions, defendant's continuous employment, the fact that defendant acted under provocation when the beer can was thrown, and the fact that defendant acted in self-defense, although not justified, and out of fear for his safety.

We note that the trial judge is generally in a superior position to determine an appropriate sentence based on the particular circumstances of the case. (*People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) The sentencing decision is based on many factors, such as defendant's demeanor, general moral character, social environment, habits and age. (*Perruquet*, 68 Ill. 2d at 154.) A trial judge is "charged with the often difficult and delicate responsibility of fashioning a sentence which will not only protect the interests of society, but will also allow for the possibility of rehabilitation of the offender." (*Perruquet*, 68 Ill. 2d at 155.) It is appropriate for the trial judge to consider the degree of harm and the manner in which the victim's death occurred, even where serious bodily harm is implicit in the offense. *People v. Saldivar* (1986), 113 Ill. 2d 256, 269, 497 N.E.2d 1138.

■ The record shows that the trial judge was fully aware of the mitigating factors in the present case and specifically noted the absence of any prior convictions, defendant's caring family, and his rehabilitative potential. However, the judge also noted defendant's confrontational role in bringing on the result, including the facts that he shouted rival gang slogans, that he was carrying a gun, and that he chose to shoot directly at the men rather than to go inside or to shoot into the air to scare the men away.

A sentence may not be altered on review absent an abuse of discretion. (*Perruquet*, 68 Ill. 2d at 154.) As demonstrated, the record discloses no abuse of discretion in the present case.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

McNULTY and COUSINS, JJ., concur.