2026 IL App (2d) 240569-U
No. 2-24-0569
Order filed February 23, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. AZMI IBRAHIM JR., Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable D. Christopher Lombardo, Judge, Presiding.
No. 22-CF-2055

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1　*Held*:　There was slight evidence that warranted instructing the jury on the lesser-included offense of involuntary manslaughter; however, the error was harmless beyond a reasonable doubt as there was ample circumstantial evidence he acted knowingly and intentionally when he shot the victim.

¶ 2　Following a jury trial in the circuit court of Lake County, defendant, Azmi Ibrahim Jr., was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and sentenced to a 50-year prison term. On appeal, defendant argues that the trial court erred in refusing to instruct the jury on the lesser-included offense of involuntary manslaughter. We affirm.

¶ 3　　　　　　　　　　　　I. BACKGROUND

¶ 4    On December 12, 2022, at around 9:30 p.m., the body of Roy Hoffman—naked except for a pair of socks—was discovered in his apartment in Fox Lake. He had suffered a single gunshot wound to the head. Hoffman's downstairs neighbor, Eric Paszczyk, testified that at about 9:30 p.m. that night, a man he did not know knocked on his door. Thinking the man might be a neighbor, Paszczyk invited him into his apartment and offered him a beer. They chatted for a few minutes, at which point the man's phone rang and he answered it. Paszczyk did not hear the details of the conversation, but he heard a female voice coming from the phone. The voice sounded "frantic" and was "screaming." The man then left Paszczyk's apartment. Shortly thereafter, Paszczyk saw the man walking upstairs toward Hoffman's apartment. The man was holding a firearm in both hands. A minute or two later, Paszczyk saw the man walking back down the stairs with a woman behind him. They got into a minivan and drove away. After a few minutes, Paszczyk walked up to Hoffman's apartment. Hoffman's door was open, and Paszczyk saw his body on the floor. Paszczyk could tell that Hoffman was deceased. Paszczyk then called 911.

¶ 5    Caalyn MacKay testified that she had been in a relationship with defendant prior to December 12, 2022. At around 9 or 9:15 p.m. on that date, she received a text message from defendant containing a photo of a gun. At about that time, MacKay engaged in a video call with defendant, who was in a motor vehicle. Defendant said that he was waiting for Kathryn Deason, who was in an apartment having sex with her "boyfriend." MacKay relayed the information to a McHenry County sheriff's deputy.

¶ 6    Deason testified that on December 12, 2022, she was at defendant's house. They were drinking and had taken some Xanax. At some point, she received a Facebook message from Hoffman offering to pay her for sex. Deason accepted, and defendant agreed to drive her in her van to Hoffman's home. Defendant remained in the van while Deason went inside. She engaged

in consensual oral and vaginal sex with Hoffman. Deason testified that defendant called her several times while she was in Hoffman's apartment, but she answered only one of the last calls, which she received while she was getting dressed. She told defendant that she was fine. While Deason was still getting dressed, her phone rang again and there was a knock on the door. Hoffman opened the door, and Deason heard defendant's voice asking if she was inside. Hoffman tried to close the door, but defendant kicked it in. Defendant was carrying a gun. He aimed it at Hoffman and told him to get down on the ground. Hoffman complied. Defendant then "pulled back something on the gun." Deason assumed that defendant was checking to see if the gun was loaded. According to Deason, "[Defendant] looked at me, and I don't know. I just didn't even recognize him. He turned back, and the gun went off. He shot him." Defendant told Deason that "he didn't mean to do it."

¶ 7    They returned to defendant's house, and defendant told her to take a shower to wash off any gunpowder residue. Eventually, she fell asleep on the couch. She awoke when she heard the police knocking on the door. They interviewed her at the police station. She initially denied going to Hoffman's apartment. Then she told the police that she went there alone. She falsely claimed that Hoffman was alive when she left and that he had raped her. The police took her to the hospital, where a rape kit was performed. Ultimately, Deason was charged with disorderly conduct and obstruction of justice in connection with her false statements to the police. She pleaded guilty under an agreement with the State and was sentenced to probation. The agreement provided that Deason would testify truthfully at defendant's trial.

¶ 8    Two interviews with defendant were conducted by investigators Jose Barrera and Greg Pilaski. Video recordings of both interviews were admitted into evidence and played for the jury. During the first interview, defendant denied owning any weapons but admitted that he had shared

photographs of weapons by text message. He explained that his "ex" had various men "talking all kinds of shit" to him, so he sent one of them a picture of a rifle.

¶ 9 Asked why he had been to Fox Lake, defendant replied that he did not know that he had been to Fox Lake and that he did not think he had ridden in Deason's van. He stated that Deason drove her van to Fox Lake for her "pimp," Leo. He later admitted that he rode in the van with Deason and Leo to an apartment building at a location he was unfamiliar with. Deason left the van, apparently to have sex with a client. Defendant and Leo remained in the van. Defendant denied exiting the van. He stated that Leo got out and returned sometime later with Deason, at which point they drove off.

¶ 10 When told he was being interviewed in connection with a shooting, defendant stated that he had never shot anybody. He stated that when Deason and Leo returned to the van, Leo said, "It shouldn't have went down like this." Deason and Leo began arguing. Defendant saw a weapon the size of an Uzi. At some point, Deason told defendant that Leo killed somebody. Barerra accused defendant of lying and of killing the victim. Defendant vehemently denied the accusation.

¶ 11 During the second interview, defendant admitted he went up to Hoffman's apartment and knocked on the door. He explained that Deason had called him and claimed that Hoffman was trying to rape her. When Hoffman opened the door, he told defendant to "get the f*** away from here" and threatened to call the police. Thinking he had knocked on the door to the wrong apartment, defendant then went downstairs and knocked on the door to another apartment. The occupant let defendant in, gave him a beer, and told him that Hoffman was "crazy."

¶ 12 Defendant went to the van, retrieved a pistol, and went back upstairs to Hoffman's apartment. Defendant told Hoffman to let Deason go. Hoffman said, "What the f*** are you going to do?" At that point, the gun "went off" and Hoffman was struck. Questioned in more detail about

- 4 -

the shooting, defendant said he did not know whether Hoffman had a gun, but there was a knife and some money on a table. Hoffman said that he had forgotten to pay Deason. At first, defendant pointed the gun at Hoffman's legs and threatened to shoot him in the leg if he "[did not] stop." Defendant explained that Hoffman was getting "hyper." When Hoffman reached toward the table—for either the money (to pay Deason) or the knife—defendant pointed the gun up. (Later in the interview, defendant indicated that Hoffman handed him the money. Deason counted it while they were either still in Hoffman's apartment or in the van after they left.) Defendant stated that he "didn't mean to pull the trigger, but it pulled." At several points during the interview, defendant stated that the gun "just fired," "just went off," or "just shot." Defendant indicated that the gun was a Draco pistol and that he had hidden it under his trailer. The weapon was ultimately recovered from that location.

¶ 13    Defendant testified that on December 12, 2022, Deason told him she had plans to go on a "companionship date." She asked defendant to come with her because the person she was going to meet seemed creepy. Defendant agreed. It was Deason's idea to bring a gun. When they arrived at Hoffman's apartment, Deason said she would be inside for less than an hour. Deason entered the building while defendant remained in her van. After about an hour and 15 minutes, defendant started texting Deason. After another half hour, he went into the building to try to find Deason. He went upstairs and knocked on the door of what turned out to be Hoffman's apartment. He asked through the door if Deason was there. A voice from inside the apartment responded, " 'No. Get the f*** out of here.' " The speaker threatened to get a gun if defendant did not leave. At that point, defendant thought that he had gone to the wrong apartment, so he went downstairs and knocked on another door. Paszczyk opened the door, invited defendant in, and offered him a beer.

Defendant told Paszczyk that he was looking for Deason. Paszczyk thought that she might be upstairs because Hoffman always had women coming and going from his apartment.

¶ 14 After a few minutes, Deason called defendant. She told him to come upstairs right away because Hoffman was raping her. Defendant heard Deason cursing and screaming at Hoffman. Defendant asked Deason where she was. She replied, " 'You were just f*** here.' " When defendant told Paszczyk that Deason was in Hoffman's apartment, Paszczyk replied, "Oh, that guy's crazy like that."

¶ 15 Defendant left Paszczyk's apartment, retrieved his gun from the van, and returned to Hoffman's apartment. Deason opened the door, but Hoffman, who must have been behind her, slammed it shut. Defendant turned the doorknob and shoved his way into the apartment. Defendant pointed the gun down at Hoffman and threatened to shoot his legs. At some point, Hoffman reached for what appeared to be a knife. Defendant testified, "Right away, *** I just said, 'No, don't f*** do that,' and I pointed up and I shot right away." Defendant later explained that his actions were, "[j]ust, you know, instinct, *** just I [*sic*] pointed the gun and *it fired*." (Emphasis added.) Defendant's attorney asked defendant, "[D]id the gun just go off?" Defendant responded, "Well, it felt like it, you know, kind of when just like it went off, but, obviously I had to pull the trigger."

¶ 16 Asked why he told the police that the gun "just went off," defendant replied,

"It kind of felt like everything happened so fast like it was like, you know, just he reached, and I just right away I had to shoot. So it was like it felt like, you know, it felt like I didn't even do it but I did it, you know, I had to pull it."

Asked how he knew that he "pulled it," defendant replied, "Because it fired." Defendant further testified that his finger was on the trigger and that he "did fire that weapon." He did so "[b]ecause

[Hoffman] reached for that knife. That was the only reason. I thought he was going to stab me." Defendant acknowledged on cross-examination that he "meant to shoot" Hoffman.

¶ 17　The trial court instructed the jury on the law of self-defense. It also gave the jury instructions and a verdict form for the offense of second degree murder under the theory that defendant was acting under the unreasonable belief that his actions were justified under the law of self-defense. See 720 ILCS 5/9-2(a)(2) (West 2020). However, the court refused defendant's tendered instruction on involuntary manslaughter. The court reasoned:

> "The defendant testified that he deliberately and intentionally shot Roy Hoffman because he was reaching for a knife. The statement that was put into evidence before the defendant's case was that he made a video statement not under oath that the gun just went off. The defendant explained it, that the gun just went off; that he pulled the trigger, it justs [*sic*] happened so fast. So I'm going to deny. I don't see the recklessness component being supported by the evidence. In fact, clearly the defendant testified he intentionally [and] deliberately defended himself by his testimony by [*sic*] shooting this man with his firearm. \*\*\*."

¶ 18　　　　　　　　　　　　　　　II. ANALYSIS

¶ 19　Defendant argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of involuntary manslaughter. "A 'lesser-included offense' is an offense proven by lesser facts or a lesser mental state, or both, than the charged offense." *People v. Perry*, 2011 IL App (1st) 081228, ¶ 28. The standard of review applicable here has been described as follows:

> "In the context of jury instructions for lesser-included offenses, decisions from our supreme court indicate a bifurcated standard of review. As to the first prong of the analysis—determining whether an offense is a lesser-included of the greater offense—our

supreme court has repeatedly said this involves a purely legal question and our review is *de novo*. [Citation.] Then, as to the second prong of the analysis—determining whether the evidence at trial supports giving the lesser-included instruction—our supreme court has said, as the parties acknowledge, that our review requires the demonstration of an abuse of the trial court's discretion." *People v. Hill*, 2020 IL App (1st) 162119, ¶ 17 (citing *People v. McDonald*, 2016 IL 118882, ¶ 42; *People v. Kennebrew*, 2013 IL 113998, ¶ 18).

¶ 20    As our supreme court has explained:

"[I]n an appropriate case, the defendant is entitled to have the jury instructed on less serious offenses that are included in the charged offense. Such a practice provides an important third option to a jury. If a jury believes that a defendant is guilty of something, but uncertain whether the charged offense has been proved, the jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense." *People v. Ceja*, 204 Ill. 2d 332, 359 (2003).

"[T]he appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense ***." (Emphasis in original.) *McDonald*, 2016 IL 118882, ¶ 25. The "some evidence" standard does not involve an assessment of the credibility of the evidence, which is a matter for the jury to decide. *Id.*

¶ 21    Evidence meeting this standard can include the defendant's own statements admitted into evidence by the State. For instance, in *People v. Willett*, 2015 IL App (4th) 130702, ¶¶ 1, 11, the defendant was prosecuted for aggravated battery to a child under the theory that the infant victim's brain injury was the result of " 'shaken baby syndrome.' " The State's evidence included the defendant's recorded interview with the police in which he stated that he gently shook the victim

to wake her or to get her to stop crying and that he did not intend to hurt her. *Id.* ¶ 18. The *Willett* court held that the statement was " 'some evidence' " that the defendant caused the injury recklessly rather than knowingly. *Id.* ¶ 91. Therefore, the defendant was entitled to an instruction on the lesser-included offense of reckless conduct.

¶ 22     Moreover, when there is some evidence that would support a verdict on a lesser-included offense, the defendant is entitled to an instruction even if the evidence is contrary to the defendant's own testimony. *People v. Everette*, 141 Ill. 2d 147, 156 (1990). In this respect, the *Everette* court noted with approval the existence of " 'support [for] the proposition that a homicide defendant may be entitled to an instruction on both accident and self-defense, two *inconsistent* affirmative defenses.' " (Emphasis added.) *Id.* (quoting *Mathews v. United States*, 485 U.S. 58, 64 (1988)).

¶ 23     We are aware that in *People v. Ciavirelli*, 262 Ill. App. 3d 966, 973-74 (1994), decided after *Everette*, the appellate court held that the defendant was not entitled to instructions on both self-defense and involuntary manslaughter where "[the] [d]efendant's primary defense *** was one of justifiable homicide (self-defense)." The court noted that ' "[b]ecause the theories of self-defense or defense of a third party presuppose an intention to kill or cause great bodily harm, these theories are inconsistent with the crime of involuntary manslaughter which, by definition, is evidenced by the mental state of recklessness, not intent." ' *Id.* at 974 (quoting *People v. DeMumbree*, 98 Ill. App. 3d 22, 25 (1981)). Notably, the *Ciavirelli* court did not mention *Everette*. More importantly, perhaps, the outcome in *Ciavirelli* appears to have depended on the absence of evidence of recklessness rather than the inconsistency of the defenses. See *id.* ("Here, although the witnesses testified that [the] defendant stumbled as the beer can struck him, there is no evidence that this caused the gun to accidentally discharge. Nor was any such claim made. To the contrary, the witnesses testified that [the] defendant aimed the gun at persons in the group and fired between

four and six shots into the group. Such deliberate action cannot be considered reckless."). In any event, *Everette*'s reasoning dictates the conclusion that a defendant charged with first degree murder is entitled to instruction on both self-defense and involuntary manslaughter if there is evidence to support both instructions. If a criminal defendant can receive instructions on inconsistent affirmative defenses (a proposition the *Everette* court appears to have embraced), we see no reason why a defendant could not be entitled to instructions on an affirmative defense and a lesser-included offense that are mutually inconsistent.

¶ 24    With these principles in mind, we consider whether the evidence supported an instruction on involuntary manslaughter. Defendant was charged with two counts of first-degree murder. As pertinent here, section 9-1 of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1 (West 2020)) provides:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> >
> > (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another."

¶ 25    Section 9-3(a) of the Code (*id.* § 9-3(a)) provides, in pertinent part, "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts *** which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." Involuntary manslaughter is a lesser-included offense of first-degree murder. *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 70. Thus,

whether defendant committed first-degree murder or involuntary manslaughter depended on his mental state. If he acted intentionally or knowingly, he committed first degree murder. If he acted recklessly, he committed involuntary manslaughter. If he acted with none of these mental states, he would not be guilty of either offense.

¶ 26    Defendant cites, as "some evidence" supporting an involuntary manslaughter instruction, his statement that the gun "just went off" and other similar statements during the police interviews. The State responds that those statements, if believed by the jury, would have established that defendant acted with *no* culpable mental state. Thus, according to the State, the evidence would not support a finding of recklessness necessary for an involuntary manslaughter conviction. The State insists that "[s]ince the [statements] defendant relies upon do not include any acceptance of responsibility for the gun discharging, defendant cannot use it as evidence of recklessness." Alternatively, the State argues that defendant's testimony that "he pointed the gun at the victim and pulled the trigger based on his fear of violence from the victim" "cannot be the basis for a finding of recklessness, because if accepted it justifies not only pointing a gun at someone, but pulling the trigger."

¶ 27    Neither argument is persuasive. Although it has been held that the accidental discharge of a weapon is not, in itself, a reckless act (*People v. Cunningham*, 2019 IL App (1st) 160709, ¶ 31), if the jury believed defendant's testimony that the gun discharged accidentally, it might still found that he acted recklessly, because "[i]t is considered settled law in Illinois that pointing a loaded firearm at another person constitutes recklessness because that conduct is a gross deviation from the standard of care exercised by a reasonable person." *People v. Lemke*, 349 Ill. App. 3d 391, 396 (2004). Regarding the State's second argument, the State appears to assume that if defendant pulled the trigger, he necessarily intended to kill or cause great bodily harm to Hoffman or knew

- 11 -

that there was a strong probability of those outcomes. Again, we disagree. Even though defendant testified that he must have pulled the trigger, his testimony suggested that he acted reflexively, without time for deliberation necessary to form a criminal intent or to appreciate the likely consequences of his actions. Under these circumstances, a rational trier of fact could conclude that defendant acted without the requisite intent or knowledge for a conviction of first-degree or second-degree murder but, nonetheless, acted recklessly by confronting Hoffman with a gun.

¶ 28 Moreover, even if defendant's trial testimony was incompatible with a theory of recklessness, that is no reason to withhold an instruction on the lesser-included offense of voluntary manslaughter, where, as in *Willett*, defendant's statements to police, which the State offered into evidence, support a finding that defendant acted recklessly, rather than knowingly or intentionally. *Everette*, 141 Ill. 2d at 156.

¶ 29 According to the State, the trial court, in refusing to give an involuntary manslaughter instruction, found that defendant's trial testimony "contextualized his statements [to the police] that 'the gun just went off' to mean that it happened quickly but not recklessly." We understand the trial court's position. As noted, however, a lesser-included offense instruction should be given when there is "some evidence" to support it (*McDonald*, 2016 IL 118882, ¶ 25), even if it is inconsistent with the defendant's testimony at trial. Defendant's statements to police—which the State offered into evidence—were some evidence that the shooting was reckless. Any question how to interpret those statements, and what weight to give them in comparison to defendant's testimony, should have been left to the jury.

¶ 30 Although the trial court erred in refusing to instruct the jury on the lesser-included offense of involuntary manslaughter, the error does not necessarily require reversal. See *People v. Washington*, 2012 IL 110283, ¶¶ 58-59 (error in failing to instruct jury on second-degree murder

does not necessarily require reversal). "Error is harmless where a reviewing court can safely conclude that a trial without the error would have produced no different result." *People v. Roman*, 323 Ill. App. 3d 988, 999 (2001). That is the case here. Defendant's evidence that he merely acted recklessly, though not *legally* dependent on his claim of self-defense, was inextricably linked to the factual narrative underlying both that defense and the theory that defendant was guilty of only second-degree murder. Whether defendant pulled the trigger purposely or inadvertently, or the gun somehow went off by itself, defendant steadfastly maintained that he confronted Hoffman with the gun because he was trying to protect Deason and that when the gun went off (for whatever reason) he was concerned that Hoffman might be reaching for a knife. Had the jury believed that that was the case, it would have either acquitted defendant or found him guilty only of second-degree murder. However, the jury clearly rejected that account, finding him guilty of first-degree murder. It is practically inconceivable that the jury, having apparently rejected that narrative, would nonetheless have credited defendant's statements to police to the effect that he did not (or did not mean to) pull the trigger when Hoffman was shot. As noted, the reason for instructing the jury on a lesser-included offense is to provide an alternative to finding the defendant guilty or not guilty of the charged offense. Here, however, the jury was already presented with, and rejected, a third option: finding defendant guilty of second-degree murder. Thus, the jury did not find defendant guilty of murder simply because it believed he was guilty of *something* and had no other option except acquittal. The possibility that an instruction on voluntary manslaughter would have changed the jury's verdict is negligible at best, and the trial court's refusal to give the instruction was harmless.

¶ 31    Before closing, we note that in *People v. Henson*, 2017 IL App (2d) 150594, and *People v. Blan*, 392 Ill. App. 3d 453 (2009), this court stated that the failure to give a lesser-included offense

instruction is *not* amenable to harmless-error analysis. We believe that those decisions can only be understood as limited to the facts and issues before the court at that time; they do not represent a unique statement of the law on jury instructions and lesser-included offenses within this district. For context, we note that the *only* instructional error that is deemed to be "structural"—and thus subject to automatic reversal—is a "a defective reasonable doubt instruction." *People v. Averett*, 237 Ill. 2d 1, 13 (2010). It stands to reason that any other type of jury-instruction error, short of distorting the standard of proof for determining guilt or innocence, *can* be assessed for harmlessness in light of the trial evidence. Failure to issue a lesser-included offense instruction could result in plain error if the evidence was close, it does not always threaten the reliability of a trial on the charged offenses. Here, the defense essentially asserted a paradox: "accidental self-defense." The jury rejected defendant's claim of self-defense, and we have no real reason to think they might have accepted the weak and incongruous explanation that Hoffman's death was, instead, merely an accident.

¶ 32                                    III. CONCLUSION

¶ 33    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 34    Affirmed.