THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANKLIN FREEMAN, Defendant-Appellant.

Second District    No. 80-454

Opinion filed September 25, 1981.

Mary Robinson, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant was charged by information on February 5, 1980, in Winnebago County with the offenses of armed robbery and home invasion. (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2 and 12—11(a)(1).) Both are Class X felonies. He was convicted by a jury and sentenced to the Department of Corrections for 12 years for each offense, the sentences to be served concurrently. He appeals, contending he was denied a fair trial (1) because the trial court restricted his cross-examination of two witnesses concerning their possible bias or motive for testifying, and (2) because the prosecutor made improper comments during rebuttal argument. We find the second contention has been waived due to the defendant's failure to make timely objections at trial and to specify the error in his post-trial motion. (*People v. Jedlicka* (1980), 84 Ill. App. 3d 483.) As to the defendant's first contention, we agree, and reverse and remand for a new trial.

Briefly, this is what occurred. On the evening of January 16, 1980, at approximately 8 p.m., Maurice Rigsby, Gladys Davis, Glenn Johnson, Willie McMillian, and Fred Smith were drinking alcoholic beverages and listening to music at Smith's apartment in Rockford. Davis admitted she was smoking marijuana. There was a knock at the door to the building downstairs which Rigsby answered. Four masked, armed men forced their way into the building and shots were fired toward the door of the apartment at the top of the stairs, narrowly missing McMillian who was

attempting to close that door. At approximately the same time, Smith grabbed his pistol and vacated the apartment via a window in a rear room. Davis and Johnson both bolted for the kitchen, McMillian for a closet. The four intruders entered the apartment, forced everyone to lie on the floor, and took $3 from Rigsby, $10 and a wallet from Johnson, and $68 from Davis' purse. Davis and McMillian both testified the latter had a conversation with one of the masked individuals during which he identified himself to McMillian as "Frankie," asked McMillian whose house it was, explaining he thought it was "D-man's house," and asking whether Davis was Smith's "old lady." Davis and McMillian both testified they recognized the masked man's voice as that of the defendant, Franklin Freeman. McMillian also testified "Frankie" refused to take a wad of bills containing $700 which he had produced from his shirt pocket upon the exhortation of the intruder wielding a shotgun to produce any other money that was in the apartment. The four masked men then left the apartment and went downstairs and outside where two of them encountered Smith, who had left the apartment earlier. Smith shot at and killed one of the two men, and the other man fired three shots at Smith, but missed. During the trial, the court sustained the State's objection of irrelevancy to evidence which defense counsel sought to elicit on cross-examination concerning 10 marijuana-filled manilla envelopes that were found on a table in the invaded apartment.

Immediately prior to trial, defense counsel informed the court in chambers that he planned to cross-examine two of the witnesses, Smith and McMillian, concerning charges that were instituted against them following the robbery in order to expose their possible bias or motive in testifying for the prosecution as a means of impeaching their credibility. He indicated to the court that one of the docket entries in Smith's case shows his bond was reduced "[b]y agreement-ASA RG & Atty" from $75,000 to $5,000 and that bond was posted. An identical notation appears on McMillian's docket sheet.

The State objected to the proposed cross-examination, arguing that before such cross-examination should be permitted, the defendant must establish that the State had made some kind of a deal with the witness, and that could be accomplished simply by asking the witness whether he had been promised anything in return for his testimony. The court instructed defense counsel to limit his inquiry to that question, and specifically prohibited him from inquiring into the matter of the bond reduction agreement. At trial, defense counsel did make that sole inquiry permitted by the court, and received "no" answers from both witnesses, thereby aborting any further explanation of any ulterior motives or expectations on the witnesses' parts.

■■■ Defendant correctly asserts that he has the right to cross-examine

government witnesses regarding pending criminal charges for the purpose of showing bias, interest, or motive to testify falsely. (*People v. Mason* (1963), 28 Ill. 2d 396; *People v. Barr* (1972), 51 Ill. 2d 50.) The right to cross-examine a witness stems from the defendant's sixth amendment right "to be confronted with witnesses against him" (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8; *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105), and this right is applicable to State trials as well as to Federal (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065).

Additionally, defense counsel need not show beforehand that any promises of leniency have been made or any expectations of special favor exist in the mind of the witness. (*People v. Baptiste* (1976), 37 Ill. App. 3d 808.) Further, defense counsel is entitled to inquire into such promises or expectations whether based on fact or imaginary. *People v. Dunivant* (1981), 96 Ill. App. 3d 62; *People v. Kellas* (1979), 72 Ill. App. 3d 445.

The State argues that the restriction on cross-examination in this case is not error or, at most, harmless error where there are other factors tending to establish the credibility of the witness. It points out that Smith did not identify the defendant, but testified merely to the fact of the robbery. As such, it concludes Smith's motives to testify falsely are unimportant with regard to this issue, and we agree. Thus, the focus narrows to a consideration of what prejudicial effect, if any, the limitation of cross-examination had with respect to the testimony of Willie "Mac" McMillian.

■■ At this point, we note the defendant has correctly observed in his reply brief that the standard of review of a claimed error affecting a Federal constitutional right is not whether it was harmless but, rather, harmless beyond a reasonable doubt. (*People v. Knippenberg* (1977), 66 Ill. 2d 276; *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) "The question is whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Chapman*, 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827.

The State's reliance on *People v. Martin* (1978), 59 Ill. App. 3d 785, *People v. Snyder* (1979), 72 Ill. App. 3d 82, and *People v. Eddington* (1979), 77 Ill. 2d 41, is misplaced in support of its position that no error occurred because defense counsel was allowed to ask the witnesses if they had been promised anything in return for their testimony. We find these cases distinguishable.

In *Martin*, the charge pending against the witness defense counsel sought to cross-examine was unrelated to the offense the defendant was charged with, and the witness testified in chambers that he had no expectation of leniency. In *Snyder*, the court's position was that cross-examination would not tend to show bias or interest where there is no

showing that a witness has any expectation of leniency as to pending charges. Also, in that case, the jury was informed that the witness, who had been the defendant's accomplice in the commission of the offense charged, had been granted immunity as to that charge, but that no other promises or concessions had been offered. In *Eddington*, the court in chambers explored the issue of potential bias/motive by questioning the witness and prosecutor. It concluded no leniency was offered or expected. It also considered that the charge pending against the witness was in a different county, and it was not filed until after the witness had given a statement and previously testified regarding the instant offense.

In contrast, the court here had been specifically alerted to the fact of the Assistant State's Attorney's agreement to a substantial reduction in bond which enabled the witness to secure release. The court did not question the witness as to his expectations of leniency, nor was the jury in any manner made aware that the witness was charged with an offense or that his bond had been reduced by agreement with the Assistant State's Attorney. Although the record reveals a one-page statement was given by McMillian shortly after the robbery and was being provided to the defendant as part of the State's answer to discovery, the statement itself was not included in the record nor utilized at trial. Furthermore, despite the fact the docket sheet on McMillian's case showed the charge pending against him was not filed until February 26, 1980 (after his alleged statement was given on January 17, 1980, and after he testified at the preliminary hearing on February 5, 1980), the record reveals the preliminary hearing was held to determine probable cause on the basis of a complaint signed by McMillian charging, *inter alia*, that the defendant had robbed him of "certain United States currency and cannibas [*sic*]." The State's discovery answer also reveals McMillian signed a rights waiver 2¼ hours before he gave his statement regarding the incident. However, the court found no probable cause on the robbery complaint signed by McMillian, and the information subsequently filed by the State for the robbery of another of the victims, Glenn Johnson, is the one for which the defendant was convicted.

■■ We conclude these facts reasonably warranted the conclusion that McMillian might have been leniency-motivated to testify against the defendant, and defense counsel should have been allowed to explore that possibility of cross-examination. Even though defense counsel was permitted to ask *whether* any promises had been made to the witness, he was prevented from making a record from which to argue *why* any promises might have been made. Given this stunted scope of cross-examination, the jury might well have thought defense counsel was simply making a baseless and inartful attack on the credibility of an already-wronged

crime victim. See *Davis v. Alaska* (1974), 415 U.S. 308, 318, 39 L. Ed. 2d 347, 355, 94 S. Ct. 1105, 1111.

The State also argues the error, if any, was harmless because McMillian was not the only witness who identified the defendant, thus he was not a crucial identification witness. (*People v. Eatherly* (1979), 78 Ill. App. 3d 777.) The State points out that the Gladys Davis, Smith's girlfriend, also testified she heard the following conversation between McMillian and "the dude [the defendant] that had him down [on the floor]":

> "A [Davis]: He said, 'Mac, is that you?' And at first Mac said no and then he asked Mac if it was Fred and Mac said yeah and Mac said, 'That's you, Frankie?' He said yeah and he asked if I was Fred's old lady. He said yeah."

McMillian's testimony indicated a similar conversation had taken place while he was standing near the closet door.

> "A: [McMillian] Okay, well, I said the person that came to the stairs, you know, person that came to the stairs and called me out of the closet, that was the person that had my direct attention.
>
> Q: [Mr. Gemignani, Assistant State's Attorney] Who was that?
>
> A: Well, it was Frankie.
>
> Q: Frankie?
>
> A: Yeah.
>
> Q: Frankie who?
>
> A: Frankie Freeman.
>
> Q: The person you identified here earlier?
>
> A: Yeah.
>
> Q: How do you know that it was Frankie?
>
> A: He said it was Frankie.
>
> Q: Tell us what was—how that went down.
>
> A: Anyway, when I came out of the closet, he asked me was I shot. I said no and he said whose house is this. He said I thought—he said I thought this was D-man's house.
>
> Q: D-man?
>
> A: Yeah, D-man's house. I said no, this is Fred's house. Then, he said is that Fred's woman there? I said yeah, but that time she just got hit, just got hit in the face, then.
>
> Q: Okay, go on.
>
> A: And then he said man, I didn't know this was Fred's house. I swear I didn't know this was Fred's house. He kept telling me he didn't know it was Fred's house. So, I just stayed there.

*     *     *

Q: Now, had there—had this man who was directing his attention to you asked you who you were?

A: Yeah.

Q: What did he say?

A: I said it was Mac.

Q: What did he say to you?

A: He said—would you ask the question again?

Q: What did he say to you, did he ask you who you were?

A: He asked me who I was. I told him I was Mac, you know, and he said I noticed this was your thing here. Then he said I'm sorry, man, you know.

Q: Did you ask him who he was?

A: No, he said who he was.

Q: What did he say?

A: He said this is Frankie, man, this is Frankie, don't you know Frankie?"

We find Davis' alleged "corroboration" is patently incredible, however. She answered these questions at trial on April 28, 1980:

"Q: [Mr. Gemignani] Did you recognize the voice?

A: Yeah.

Q: Whose voice was it?

A: Frankie.

Q: Frankie who?

A: Freeman.

*  *  *

Q: How long have you known Frankie Freeman?

A: A little while.

Q: Well, is that a week, two weeks, a year?

A: More than two weeks.

Q: How many times have you sat down and talked with him?

A: I never talked to him."

On the face of the record, Davis did not know the defendant until shortly before the trial. Even if the record may be construed to mean she knew him approximately two weeks before the robbery occurred, the extent of her knowledge does not ever include a conversation with him, yet she claimed she recognized his voice. Further, if she did know him, why did both she and McMillian testify that the defendant asked McMillian if "she was Fred's lady"? Apparently the defendant did not know her. Her credibility must also be considered in light of the fact she admitted she was smoking marijuana that evening.

■■ Under these circumstances, McMillian's testimony became crucial since he was the only other witness whose testimony placed the defendant in the apartment that night. It is our conclusion that the trial court abused

its discretion in limiting defense counsel's cross-examination, particularly in view of the fact the limitation occurred before the trial actually commenced and before the court knew who would be testifying as to what. The court would have had no inkling at that time as to the potentially crucial nature of McMillian's and/or Smith's testimony. We do not believe this error may be construed to be harmless beyond a reasonable doubt. Consequently, the judgment of the circuit court of Winnebago County is reversed and the cause remanded for a new trial.

Reversed and remanded.

SEIDENFELD, P. J., and LINDBERG, J., concur.