THIRD DIVISION

AUGUST 28, 2002

1-00-1204

THE PEOPLE OF THE STATE OF ILLINOIS )  Appeal from the Circuit

                )  Court of Cook County

Plaintiff-Appellee,            )

                     )   

v.         )  

                                    ) 

LAMONT SMITH,      )  Honorable Robert

            )  Bertucci, Judge 

Defendant-Appellant.      )  Presiding.

                 

JUSTICE CERDA delivered the opinion of the court: Defendant, Lamont Smith, appeals after a jury verdict finding him guilty of first-degree murder and attempted armed robbery.  The arguments that we address are that (1) the trial court erred in denying his motion to quash arrest and suppress evidence on the basis that there was no probable cause to arrest him without a warrant; (2) the trial court erred in denying his motion to suppress his confession on the basis that it was not voluntarily made; (3) defendant was denied a fair trial by the admission into evidence of incriminating grand jury testimony of a person who was deceased at the time of trial; (4) defendant was denied a fair trial by gruesome photographs of the murder victim and the murder scene; and (5) defendant was not proven guilty beyond a reasonable doubt.

BACKGROUND

 Defendant was charged with attempted armed robbery and the first-degree murder of Annie Hamler occurring on January 20, 1997. 

Defendant filed a motion to quash arrest and to suppress evidence, arguing that his arrest was made without a warrant or probable cause.  

At the hearing on the motion, Chicago police detective Alfonso Bautista testified that at about 4 a.m. on December 8, 1997, defendant was arrested for criminal trespass to a vehicle.  After he was released, he was arrested again, for the murder of Hamler, around 8 or 8:30 a.m. of the same day, pursuant to a stop order.  There was no warrant for defendant. 

[The following material is nonpublishable.]

Nonpublishable material removed here.

[The preceding is nonpublishable.]

The trial court denied the motion to quash arrest, finding that there was probable cause to arrest defendant. 

Defendant also filed a motion to suppress his statements.  He argued that he was not informed of his rights, that his statement was not made voluntarily, knowingly, and intelligently, that he was physically and psychologically coerced, and that he had elected to consult with an attorney prior to further questioning.  

At the hearing on the motion to suppress, Detective Bautista and his partner, Detective Paul Lopez, testified about defendant’s interrogation.  Defendant did not testify.  

At 9 a.m. on December 8, 1997, Detectives Bautista and Lopez met defendant at the police station.  When they entered the room, defendant was handcuffed to a ring on the wall.  Defendant was unhandcuffed, the detectives introduced themselves, and Detective Lopez read defendant his 
Miranda
 rights.  Defendant said he understood those rights and wished to speak to them.  Both detectives questioned defendant for 20 to 30 minutes.  When they left, defendant was not handcuffed.  The detectives spoke to defendant again that day at 5 or 6 p.m.  They readvised defendant of his rights.  They talked to defendant about taking a polygraph.  The interview lasted half an hour.  

On December 9, the detectives spoke to defendant for half an hour around 9:30 or 10 a.m.  Defendant was again advised of his rights.  Around 5 or 6 p.m., the detectives interrogated defendant for about 30 minutes, and defendant denied involvement and agreed to take a polygraph.  They transported defendant to another location for a polygraph at 6 p.m.  Defendant was handcuffed in the car on the away to the exam.  The polygraph questioning lasted 40 minutes.  Defendant was transported back to the police station.  They questioned defendant for 1½ to 2 hours beginning at 7:30 p.m.  Defendant was readvised of his rights. 
Defendant was not handcuffed.  
Defendant was told that he did not pass the polygraph. 

Detectives Lopez and Bautista spoke to defendant at 10 a.m. on December 10 for 20 minutes.  Defendant was again advised of his rights.  Defendant said he did not want to talk to them and that he was afraid.  The detectives left about 10:20 a.m.  

At about 10:20 or 10:40 p.m. on December 10, Detective Lopez had another conversation with defendant.  During that questioning, defendant admitted for the first time
 that he participated in the crime.  
At about midnight, Assistant State’s Attorney Steve Klaczynski arrived and questioned defendant for 20 minutes, 
again advising defendant of his rights.  Defendant admitted to the assistant State’s Attorney that he was involved. Defendant said he wanted to think more about whether to give a statement, and the assistant State’s Attorney left the room.  Detective Lopez remained, talking with defendant for 60 or 90 minutes.  
Detective Lopez called the assistant State’s Attorney back into the room, and defendant repeated his statement.  The questioning lasted 30 to 40 minutes, ending about 12:30 or 12:45 a.m.  

At 1 a.m. on December 11, the detectives had a discussion with defendant and drove defendant, who was handcuffed, out to Harvey, where defendant pointed out a house where the third offender lived.  They did not find the other man.  At 3 a.m., 
defendant was taken back to the police station.  Detective Lopez interviewed defendant again, in the presence of the assistant State’s Attorney who readvised defendant of his rights.  Defendant said he understood his rights.  The questioning lasted 45 to 60 minutes.  Defendant again admitted being involved in the case, but defendant said that he did not want to give a written statement. 

Defendant was brought to a courtroom at noon on December 12.   The detectives denied that they psychologically or physically coerced defendant.  They also denied that defendant ever said he wanted to talk to a lawyer. 

The room in which defendant was interviewed was either 8 by 10 feet or 12 by 10 feet and contained a bench, a table, and some chairs.  There was no bed, couch, clock, or windows.  During his custody, defendant was given food, drinks, and cigarettes and was allowed to use the bathroom on request.  Defendant was not handcuffed during any of the interrogations.  

The motion to suppress was denied.  

Prior to trial, the State filed a motion to present to the jury statements made before a grand jury by witness Jessie Hodges, who had since died.  Hodges had testified that defendant had admitted his involvement in the murder.  The trial court granted the State's motion.  Hodges’ statements were read to the jury.

Lakisha Hamler testified at the trial that the victim was her aunt.  The victim lived in her apartment at 111 N. Wood Street with four children and a boyfriend, who was involved in selling drugs with someone named “Sco.” 

Hamler further testified that, on the morning of January 20, 1997, someone knocked on the door of the victim’s apartment, identifying himself as “Tonio.”  The victim opened the door, and someone struggled with her, trying to pull her into the hallway.  The person held the victim in a choke hold, asking where the “stuff” was.  She could not tell how old the person was because it was dark in the hallway.  He wore a black, hooded sweater and black pants.  The man turned her aunt around, and another man came from around the corner and shot her aunt in the face.  She did not get a chance to see the man with the gun, but she saw that he was wearing black, including a black baseball cap.

Hamler further testified that later that day 
she viewed a photo array.  She identified the photo of Desmond Hampton as the person who struggled with her aunt before she was shot.  Later that day, 
she also observed a lineup with five people.  She again identified Hampton.  She again looked at a lineup on December 11, 1997.  Defendant was in the lineup, but she was not able to identify him as being involved.  She initially was positive of her identification of Hampton but later told the police she was wrong.

Detective Paul Lopez testified that Lakima, Lakisha, and Monique Hamler identified Hampton as the man struggling with their aunt.  

Sebrina Brown testified that she was one of the three offenders involved in this case.  On November 17, 1997, she was interviewed by the police.  The State agreed to dismiss three murder counts in exchange for her testimony.  She pled guilty to attempted armed robbery.  The State would recommend that she be sentenced to 15 years’ imprisonment. 

Brown further testified that on January 18, 1997, she was with Jerry Dixon, when a man approached Dixon asking if he wanted to buy a shotgun.  Dixon bought the gun, which he asked her to keep until the morning.  Dixon did not come the next day to retrieve the gun.  

Brown further testified that on January 20, 1997, defendant came to her home.  Defendant asked if he could use the gun in a robbery.  They agreed to rob someone of drugs or money. 

Brown further testified that they went outside to a car where someone she did not know was sitting.  The man was light skinned and had a tear-drop tattoo on the left side of his face.   They drove to 111 N. Wood Street.  After they arrived, defendant grabbed the gun and told her that he was planning to take “some packs that old girl is holding for Sco.”  By “packs,” he meant drugs.  “Sco” was the drug dealer in the neighborhood.  The other man took the gun away from defendant when the two men got out of the car; she remained in the car.

Brown further testified that, when defendant and the other man returned from the building, defendant told the other man that he thought that the other man had shot “old girl.”  Defendant described the victim to her, and she told defendant that the victim was “Nook,” which was Annie Hamler’s nickname.  They drove to Harvey.  Later, she went home, and she dropped the gun into the incinerator.  

Brown further testified that in June 1997 she spoke to her boyfriend, Jesse Hodges, about the incident.  They had been boyfriend and girlfriend about 1½ years.  However, at the end of 1996 until the beginning of 1997, she was defendant’s girlfriend.  She stayed friends with defendant.

Johnny Patterson testified that, on the morning of the day of the murder, he was in the parking lot near 140 N. Wood Street.  He saw defendant, who said he was planning to rob “Sco people.”  Defendant took off in a burgundy car driven by a light-skinned black man wearing a dark leather jacket.  The other man had a teardrop tattoo on his “left side.”  Defendant was wearing a black jacket and a skullcap.  Patterson testified about his prior convictions.

Chiao Viscardi, a former assistant State’s Attorney, testified that she met with Hodges about this case on December 12, 1997, while he was in custody.  After the interview, she presented him to a grand jury, where he testified under oath.  She was the only lawyer who asked questions; no lawyer cross-examined Hodges. 

The grand jury transcript was published to the jury.  Hodges testified that no one had made any threats or promises to him.  
He was in the Gangster Stone gang while defendant was a member of the Four Corner Hustlers gang.  Defendant went out with Brown before Hodges did.  Defendant was his really good friend; he saw defendant almost every day.  

Hodges further testified before the grand jury that in June 1997, while he was smoking marijuana with defendant, defendant told him that Brown knew something that could put him in jail for the rest of his life.  Defendant told him that he had something to do with the killing of Nook.  Defendant told him that he said to the other person that he thought the other person shot Nook.  Defendant said that Brown waited in the car, drove the other person to Harvey, and later dropped the gun into an incinerator chute at home. 

Viscardi further testified that Hodges was convicted in 1997 of possessing a stolen motor vehicle.  In 1998, Hodges was killed by a police officer when he tried to drive a stolen vehicle towards a police officer on foot.   

Detective Lopez testified about interviewing defendant.  After confronting defendant with the statements made by Brown, Patterson, and Hodges, defendant said he would tell the truth.  Defendant admitted his involvement in the attempted armed robbery, claiming that the other offender went to the door while defendant waited in the hallway. 

Assistant State’s Attorney Steve Klaczynski testified that defendant admitted his involvement in the plan to commit a robbery.  Defendant related that someone named Esau agreed to do the robbery with them.  Brown told Esau that defendant could not do the robbery because he would be recognized.  Defendant stated that Esau put the shotgun to the victim’s head.  

[The following is nonpublishable.]

Nonpublishable material removed here.

[The preceding is nonpublishable.]

The jury returned a verdict of guilty of both crimes.  

Defendant’s motion for a new trial and supplemental motion for a new trial were denied.  Defendant was sentenced to 50 years’ imprisonment for first-degree murder and 30 years’ concurrent imprisonment for attempted armed robbery.  

Defendant appealed.  

ANALYSIS 

[The following is nonpublishable.]

Nonpublishable material removed here.

[The preceding is nonpublishable.]

Motion to Suppress Confession

Defendant argues that the trial court erred in denying his motion to suppress his confession on the ground that his statements were not voluntarily made primarily because of the length and condition of detention, his expression of fear, and his assertion of the right to remain silent. 

A statement made as a result of a custodial interrogation is admissible if, after being advised of 
Miranda
 rights, the suspect voluntarily waives his rights prior to making the statement.  
Miranda v. Arizona
, 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707
, 86 S. Ct. 1602, 1612 (1966).  It is the State’s burden to show by a preponderance that a defendant’s admission was voluntary.  
People v. Harper
, 36 Ill. 2d 398, 401, 223 N.E.2d 841 (1967).  

A defendant’s statement is voluntary where, under the totality of the circumstances, it has been given freely, voluntarily, and without compulsion or inducement.  
People v. House
, 141 Ill. 2d 323, 376, 566 N.E.2d 259 (1990).  In assessing the totality of the circumstances, the factors to be considered include defendant’s age, education, and intelligence, whether defendant was advised of his constitutional rights, the length and duration of the detention and questioning, and whether defendant was physically mistreated.  
House
, 141 Ill. 2d at 376; 
People v. Haymer
, 154 
Ill. App. 3d
 760, 770, 506 
N.E.2d
 1378 (1987).

We will accord great deference to the trial court's factual findings in reviewing whether a defendant's confession was voluntary.  
In re G.O.
, 191 Ill. 2d 37, 50, 727 N.E.2d 1003 (2000).  
We will reverse those findings only if they are against the manifest weight of the evidence.  
In re G.O.
, 191 Ill. 2d at 50. 
 The ultimate question of whether the confession was voluntary is reviewed 
de
 
novo
.  
In re G.O.
, 191 Ill. 2d at 50. 

There was no question that defendant had the mental capacity to understand his rights.  Defendant was 24 years old and had an eleventh
 grade education at the time of his arrest.  Defendant had prior experience with the criminal justice system due to several prior convictions.  The detectives testified that defendant was advised of his constitutional rights prior to all interviews and that defendant stated he understood his rights.  

 The trial court’s ruling that defendant was not mistreated was not against the manifest weight of the evidence.  
Defendant was handcuffed only when he was transported for the polygraph examination and during the trip to Harvey to search for the other offender.  Defendant was given food, drinks, and cigarettes.  Defendant was not denied access to the bathroom.  

We next examine the conditions of defendant’s detention. 
The room where defendant was detained was not very small but lacked windows.  On the other hand, there was no bed or couch to allow defendant to sleep comfortably, and there was no evidence that defendant appeared alert and rested.   

Defendant was arrested at about 8 a.m. on December 8.  He first admitted his participation some time in the interrogation between 10:40 p.m. and midnight on December 10; up until that night, he had been interrogated a total of between four and five hours and had been in custody for over 60 hours.  Defendant again admitted his participation after 3 a.m. on December 11, after being in custody for about 67 hours.  Defendant’s detention was lengthy.  See 
Haymer
, 154 Ill. App. 3d 760 (defendant’s first detention of 60 hours was lengthy); 
cf
. 
People v. Williams
, 230 Ill. App. 3d 761, 595 N.E.2d 1115 (1992) (although defendant gave a statement between 57 and 60 hours after arrest, his confession was voluntary). 

It is clear that the interrogation technique used by the police was a factor in obtaining defendant's confession.  The first day defendant was questioned at 9 a.m. for 20 to 30 minutes and was questioned again at 5 or 6 p.m. for 30 minutes.  The second day he was questioned for 30 minutes at around 9:30 a.m.  He was then questioned for 30 minutes at 5 or 6 p.m. and questioned for 1½ to 2 hours at 7:30 p.m.  On the third day, he was questioned for 20 minutes at 10 a.m. at which point defendant told the police he did not want to talk to them.

Defendant had been questioned for two days when he asserted his right to remain silent.  
Interrogation must cease if defendant indicates in any manner prior or during questioning that he wishes to remain silent.  
Miranda
, 384 U.S. at 444-45, 16 L. Ed. 2d at 707
, 86 S. Ct. at 1612.  The interrogation may be resumed, but any statement resulting from the renewed questioning is admissible only if the suspect’s right to remain silent was scrupulously honored.  
Michigan v. Mosley
, 423 U.S. 96, 103-04, 46 L. Ed. 2d 313, 321
, 96 S. Ct. 321, 326 (1975).

It should have been clear to the police that to continue to question defendant would have been coercive.  His right to remain silent was not scrupulously honored.  It should not have been ignored; his right should not have been violated.  Defendant had been worn out by the continual questioning.  The questioning of the defendant on the night of December 10
 coerced him to confess.

Based on the repeated questioning, including 
the requestioning of defendant by one of the same detectives after his assertion of his right to remain silent, defendant’s statement that he was afraid, defendant’s detention for over 60 preceding his first admission, and the lack of normal sleeping conditions, we hold that defendant's confession was not voluntary.  The trial court erred in denying defendant’s motion to suppress his confession. 

The admission of the evidence of defendant’s coerced confession could not have been harmless error.  
People v. Wilson
, 116 Ill. 2d 29, 41-42, 506 
N.E.2d
 571 (1987).  Defendant is entitled to a new trial.

Constitutionality of Section 115-10.4

The trial court admitted the grand jury testimony of Hodges, who died before defendant’s trial, pursuant to the hearsay-exception statute governing admissibility of the statements of deceased persons.  725 ILCS 5/115-10.4 (West 2000).  We choose to address 
defendant’s argument that section 115-10.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.4 (West 2000)
) is unconstitutional under the confrontation clauses of the United States and Illinois Constitutions. 
 Defendant
 contends that (1) the statute allows statements into evidence where confrontation is impossible; and (2) the statute is not consistent with the United States Supreme Court’s standards evaluating hearsay under the confrontation clause of the United States Constitution.
 

Whether a statute is constitutional is a question of law reviewed 
de
 
novo
.  
People v. McClanahan
, 191 Ill. 2d 127, 132, 729 
N.E.2d
 470 (2000).
 

Section 115-10.4 is part of the Code of Criminal Procedure of 1963 and provides:

“(a) A statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the declarant is deceased and if the court determines that:

(1) the statement is offered as evidence of a material fact; and

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence.

***

(c) Unavailability as a witness under this Section is

limited to the situation in which the declarant is deceased.

(d)  Any prior statement that is sought to be admitted under this Section must have been made by the declarant under oath at a trial, hearing, or other proceeding.”

725 ILCS 5/115-10.4 (West 2000). 

The confrontation clause of the United States Constitution provides: “In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***.”  U.S. Const., amend. VI
.
  The language of the confrontation clause of the Illinois Constitution is very similar: “In criminal proceedings, the accused shall have the right *** to be confronted with the witnesses against him or her ***.”  Ill. Const. 1970, art. I, 
§
8
.

The confrontation clause guarantees a 
defendant
 the right to confront his accusers and ensures the reliability of evidence against a 
defendant
 by subjecting it to rigorous testing in an adversary proceeding.  
Maryland v. Craig
, 497 U.S. 836, 845, 111 L. Ed. 2d 666, 678, 110 S. Ct. 3157, 3163 (1990). 
 Cross-examination is “'the greatest legal engine ever invented for the discovery of truth.'” 
 
California v. Green
, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935 (1970), quoting 5 J. Wigmore, Evidence 
§
1367.

The confrontation clause does not prohibit all hearsay, as 
defendant
 implies.  The framers of the sixth
 amendment intended to respect certain unquestionable rules of evidence in drafting the Confrontation Clause.  
Lilly v. Virginia
, 527 U.S. 116, 125, 144 L. Ed. 2d 117, 127, 119 S. Ct. 1887, 1894 (1999).
  
A technical reading of the confrontation clause would have the effect of excluding hearsay evidence, such as dying declarations, whose admissibility was not questioned by the framers.  
Lilly
, 527 U.S. at 125-26, 144 L. Ed. 2d at 127, 119 S. Ct. at 1895.  
 Hearsay statements satisfy the confrontation clause of the United States Constitution if they fall within “a firmly rooted hearsay exception” or if they contain “particularized guarantees of trustworthiness” such that adversarial testing would be expected to add little, if anything to the statement’s reliability.  
Ohio v. Roberts
, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539 (1980).
  
Statements falling within firmly rooted hearsay exceptions are as credible as those produced by the Constitution’s preference for cross-examined trial testimony.  
Lilly
, 527 U.S. at 126, 144 L. Ed. 2d at 127-28,
 119 S. Ct. at 1895. 

A hearsay exception is said to be "firmly rooted" if, in light of long-standing judicial and legislative experience, it rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection.  
Lilly
, 527 U.S. at 126, 144 L. Ed. 2d at 127-28, 119 S. Ct. at 1895 (1999).
  

There is a presumption that non-firmly-rooted hearsay is unreliable.  
Idaho v. Wright
, 497 U.S. 805, 818, 111 L. Ed. 2d 638, 654, 110 S. Ct. 3139, 3148 (1990).  

We reject the contention that section 115-10.4 diverges from the confrontation clause standards set by the United States Supreme Court.  The statute’s standard of “equivalent circumstantial guarantees of trustworthiness” is only slightly different from the federal standard of “particularized guarantees of trustworthiness.”  "Equivalent" is similar because it means equivalent to the elements of reliability contained in the firmly rooted hearsay exceptions.  In fact, the federal residual-hearsay exception contained in Federal Rule of Evidence 807 also uses the term "equivalent circumstantial guarantees of trustworthiness."  
We hold that the Illinois test is comparable to the federal test and does not allow hearsay that would violate the confrontation clause of the United States or Illinois Constitution.  

Defendant also argues that section 115-10.4's phrase “equivalent circumstantial guarantees of trustworthiness” is unconstitutionally vague because people of common intelligence must guess at its meaning.  

A legislative act that is so vague, indefinite, and uncertain that the courts are unable, by accepted rules of construction, to determine with any reasonable degree of certainty what the legislature intended will be declared to be void.  
In re R.C.
, 195 
Ill. 2d
 291, 298-99, 745 
N.E.2d
 1233 (2001).  A criminal statute that is so indefinite that it encourages
 arbitrary convictions is void for vagueness. 
 
Colautti v. Franklin
, 439 U.S. 379, 390, 58 L. Ed. 2d 596, 606, 99 S. Ct. 675, 683 (1979).
  A statute is presumed constitutional.  
McClanahan
, 191 
Ill. 2d
 at 131.

The nature of residual-hearsay exceptions dictates that there cannot be a more specific statutory definition of which residual-hearsay statements are sufficiently trustworthy.  The factors established by case law will ensure that the statute will not be used to arbitrarily convict defendants.  We hold that section 115-10.4 is not unconstitutionally vague.

We hold that the statute is constitutional. 

Grand Jury Testimony

Defendant argues that the grand jury testimony of Hodges was untrustworthy and should not have been admitted under section 115-10.4.  We will address the issue because it is likely to reoccur after retrial. 

Federal cases note that the residual-hearsay exception of Federal Rule of Evidence 807
(footnote: 1) 
should be used rarely and in exceptional circumstances.  
E.g.
, 
Huff v. White Motor Corp.
, 609 F.2d 286, 291 (7th 
Cir. 1979); 
United States v. Fernandez
, 892 F.2d 976, 982 (11th 
Cir. 1989) (only extraordinary grand jury testimony could possibly be admitted under rule)
.  Section 115-10.4 should also be limited to exceptional circumstances because, like Federal Rule of Evidence 807, it requires hearsay to have circumstantial guarantees of trustworthiness equivalent to established hearsay exceptions.  

We note that there are no nonstatutory residual-hearsay exceptions in Illinois in criminal cases.  When our supreme court was urged to adopt a residual-hearsay exception outside of a hearsay statute, the court stated:

"Our General Assembly has made a determination that prior inconsistent statements may be admitted as substantive evidence only when the requirements of section 115-10.1 are met.  

We are unwilling to judicially amend section 115-10.1 to include a catch-all 'residual exception' to the hearsay rule.  If a prior inconsistent statement is to be admitted in Illinois in a criminal trial as substantive evidence against a defendant, the statement must meet the requirements set out by the General Assembly in section 115-10.1.  If the prior statement fails to meet these requirements, it is not admissible as substantive evidence.”  
People v. Redd
, 135 Ill. 2d 252, 313-14, 553 N.E.2d 316 (1990).  

Various factors have been used to analyze the admissibility of a hearsay statement for purposes of the confrontation clause.  They include
 
(1) 
the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; (2) in the case of prior testimony, whether it was given voluntarily under oath subject to cross-examination and a penalty for perjury; (3) the grand jury witness’s relationship with both the 
defendant
 and the government, and the motivation to testify before the grand jury; (4) the extent to which the witness’s testimony reflected personal knowledge; (5) spontaneity and consistent repetition; (6) the mental state of the declarant; (7) the lack of a motive to fabricate (
Wright
, 497 U.S. at 821-22, 111 L. Ed. 2d at 656
, 110 S. Ct. at 3150 (1990)); and (8) the reasons for the witness’s unavailability (
United States v. Snyder
, 872 F.2d 1351, 1355-56 (7th 
Cir. 1989))
.  We believe that these factors can also be used to analyze trustworthiness of hearsay under section 115-10.4.
 

A treatise has noted additional factors that can be used to analyze statements for their trustworthiness.  T. Mauet & W. Wolfson, Trial Evidence 236 (2d ed. 2001).
  A partial list of these factors includes: whether the declarant was trying to gain favor or leniency; whether he was under duress or pressure; whether the declarant ever recanted or reaffirmed the statement; whether the statement was made in response to leading questions; and whether the statement was made long after the time of the event.  T. Mauet & W. Wolfson, Trial Evidence 236 (2d ed. 2001).
 

We note that, because hearsay evidence must possess indicia of reliability by virtue of its inherent trustworthiness,
 evidence corroborating a hearsay statement cannot be a factor in finding trustworthiness under the confrontation clause.  
Lilly
, 527 U.S. at 137-38, 144 L. Ed. 2d at 135, 119 S. Ct. at 1900.  
We will not consider whether other evidence corroborated Hodges’ testimony.

We find a few factors in favor of finding Hodges’ grand jury testimony trustworthy.  They are: (1) his testimony was never recanted (although there was not much time in which to do so, as he lived only until the following year); (2) the testimony was consistent with his prior statements to the police; (3) he claimed to be a friend of 
defendant; and (4) the reason for his unavailability was death and not refusal to testify.

The State asserts that the grand jury testimony was trustworthy because it was made under oath.  However, as section 115-10.4 states that it only applies to statements made under oath (725 ILCS 5/115-10.4(d) (West 2000)), an oath taken before giving grand jury testimony cannot be a factor in finding trustworthiness under the statute.

The State also asserts that a factor of trustworthiness was that the testimony was based entirely on Hodges’ personal knowledge.  However, Hodges only had personal knowledge of his conversation with 
defendant; 
Hodges did not have personal knowledge of defendant’s involvement in the crimes.  

The State finally points out that Hodges had the capacity to testify because he was not a minor and because he was not under the influence of drugs and alcohol.  
However, the fact that a witness is 18 years old and is not intoxicated or under the influence of drugs when testifying does not indicate special trustworthiness.  See 
People v. Quick
, 308 
Ill. App. 3d
 474, 480, 720 
N.E.2d
 1137 (1999) (lack of influence of alcohol or drugs at time of prior statement was not a sufficient factor establishing inherent trustworthiness).

Defendant 
first argues that a factor of untrustworthiness was Hodges’ motivation to testify falsely because Hodges was a member of a different gang than 
defendant
.  We agree because, although Hodges’ gang was not established to be a rival gang, there was a possibility of gang bias.  

Defendant also points out that he and Hodges had both dated Brown.  Certainly a declarant’s disinterest is an indicator of reliability of testimony.  
United States v. Hooks
, 848 F.2d 785, 797 (7th 
Cir. 1988).  We agree that there was a possibility Hodges resented defendant because defendant was previously Brown's boyfriend.

Defendant correctly asserts that Hodges’ prior criminal conviction and his alleged theft of a car at the time of his death affected his credibility negatively.  See 
People v. Diaz
, 297 Ill. App. 3d 362, 368, 696 
N.E.2d 
819 (1998) (witness’s testimony was suspect due to criminal background). 
 

In addition, the use of marijuana by Hodges at the time of his conversation with defendant is a factor against trustworthiness.  See 
People v. Freeman
, 100 
Ill. App. 3d
 478, 484, 426 
N.E.2d
 1220 (1981) (credibility of eyewitness was affected by her smoking marijuana at time of the offense).

Defendant also asserts that Hodges could have made a deal with the State in exchange for his testimony.  Such a deal would have been a factor against trustworthiness.  
See 
United States v. Fernandez
, 892 F.2d at 982 
(distortion may occur when immunized grand jury witnesses answer leading questions posed by partisan attorneys).
  Although Hodges testified that no promises had been made to him, the fact that he had been in police custody at the time of his grand jury testimony indicates the possibility that he testified in the hopes of making a deal.  Defendant argues that another circumstance indicating that Hodges made a deal was that Hodges was picked up by police regarding the murder, but there was no information making Hodges a suspect at the time of his questioning.

Defendant argues that an additional factor of untrustworthiness was that there was no opportunity for testing the truth of Hodges’ grand jury testimony through cross-examination.  

Federal courts consider the opportunity for cross-examination in grand jury testimony as a factor in determining trustworthiness under the federal residual-hearsay exception; the lack of opportunity does not automatically preclude admission of grand jury testimony.  See, 
e.g
., 
Fernandez
, 892 F.2d at 981 (court refused to adopt a 
per
 
se
 ban on admission of grand jury testimony, although court noted the lack of testing by cross-examination);
 
United States v. Gonzalez
, 559 F.2d 1271, 1273 
(5th Cir. 1977) (lack of cross-examination was one factor against admission of grand jury testimony)
.

 An Illinois case interpreting a statute similar to section 115-10.4 found that, because the declarant's grand jury testimony was not subject to meaningful cross-examination, it did not bear sufficient indicia of trustworthiness and should not have been admitted.  
People v. Brown
, 303 Ill. App. 3d 949, 962, 709 N.E.2d 609 (1999) (the statute was 
section 115-10.2 (725 ILCS 5/115-10.2 (West 1996)), which 
governs admissibility of prior statements when witnesses refuse to testify despite court order).

We also note that the importance of cross-examination is reflected in the hearsay exception for former testimony, which requires that there had been ample opportunity to cross-examine the declarant (
People v. Rice
, 166 
Ill. 2d
 35, 39, 651 
N.E.2d
 1083 (1995)).  In this regard, Hodges’ statements did not have guarantees of trustworthiness that were equivalent to the former-testimony hearsay exception.

We conclude that it is a significant factor militating against trustworthiness that Hodges’ 
grand jury testimony was not subject to cross-examination.  
Cross-examination could have explored the possibility of Hodges’ bias and motivations to lie.  However, we do not hold that the lack of opportunity for cross-examination will always render grand jury testimony of a deceased declarant inadmissible.

The State has failed to point out considerable assurances of trustworthiness.  After considering the totality of the circumstances surrounding the declaration, including the lack of cross-examination, Hodges being in police custody when he testified, the possibility of motivation to testify falsely because Hodges’ girlfriend had previously dated 
defendant
 and because of Hodges’ and defendant’s membership in different gangs, Hodges’ prior conviction and his alleged commission of theft at the time of his death, and Hodges’ use of marijuana at the time of defendant’s alleged confession, we hold that Hodges’ grand jury testimony
 should not have been admitted under section 115-10.4 because it did not contain circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions such that adversarial testing would add little to its reliability.  For the same reasons, the evidence did not meet the federal standard of particularized guarantees of trustworthiness, and the admission violated the sixth
 amendment’s right of confrontation.  The State failed to rebut the presumption that the non-firmly-rooted hearsay in this case was unreliable.  

[The following is nonpublishable.]

Nonpublishable material removed here.

[The preceding is nonpublishable.]

As we have concluded, in a nonpublishable portion of the opinion, that the evidence in the trial was sufficient to support

a guilty verdict, we must reverse and remand for a new trial.   

[The following is nonpublishable.]

Nonpublishable material removed here.

[The preceding portion is nonpublishable.] 

The judgment of the trial court is reversed, and the cause is remanded.

Reversed and remanded.

WOLFSON and SOUTH, JJ., concur.

FOOTNOTES
1:
Federal Rule of Evidence 807, which is not limited to the prior statements of deceased witnesses, states in relevant part: “A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.”  Fed. R. Evid. 807.  

The hearsay exceptions in Federal Rule of Evidence 804 are for former testimony, statement under belief of impending death, statement against interest, statement of personal or family history, and statement offered against a party that procured the unavailability of the witness.  The exception for former testimony requires that the party against whom the testimony was now offered “had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.”  Fed. R. Evid. 804(b)(1).  Federal Rule of Evidence 803 contains numerous hearsay exceptions in which the availability of the declarant is immaterial, such as present sense impression, excited utterance, and recorded recollection.  Fed. R. Evid. 803.